1   Morgan Ricketts (Bar No. 268892)
2   **RICKETTS LAW**
3   540 El Dorado Street #202
    Pasadena CA 91101
4   T: (213) 995-3935. F: (213) 995-3963
5   Email:  morgan@morganricketts.com
    Attorney for Plaintiffs Lourdes Toman, Antonio Paredes, and Alan Castro
6
7
8                    **UNITED STATES DISTRICT COURT**
                     **CENTRAL DISTRICT OF CALIFORNIA**
9
10  LOURDES TOMAN, an individual,    ) Case No.:  8:20-cv-00046-DOC-KES
    ANTONIO PAREDES, an              )
11  individual, and ALAN CASTRO, an  )
    individual,                      )
12                                   )
            Plaintiffs,              ) **COMPLAINT FOR**
13                                   ) **1. *MONELL* VIOLATION**
                                     ) **2. UNREASONABLE SEARCH IN**
14          v.                       )    **VIOLATION OF 4TH**
                                     )    **AMENDMENT (42 U.S.C. §**
15  BREA POLICE DEPARTMENT;          )    **1983)**
    JERRY GLOMBOSKE, sued in his     ) **3. EXCESSIVE**
16  individual capacity; FULLERTON   )    **FORCE/UNREASONABLE**
    POLICE DEPARTMENT;               )    **SEIZURE IN VIOLATION OF**
17  FULLERTON POLICE OFFICERS        )    **4TH AMENDMENT (42 U.S.C.**
    DAVIS CRABTREE (#1467),          )    **§ 1983)**
18  RICHARD HERRERA (#1260),         ) **4. UNLAWFUL**
    MICHAEL MCCASKILL (#1449),       )    **ARREST/UNREASONABLE**
19  DAVID MACSHANE (#1274),          )    **SEIZURE IN VIOLATION OF**
    KEVIN PEDROSA, and DANIEL        )    **4TH AMENDMENT (42 U.S.C.**
20  PEREZ (#1547), all sued in their )    **§ 1983)**
    individual capacities; and DOES 1- ) **5. RETALIATION IN**
21  10, inclusive;                   )    **VIOLATION OF 4TH**
            Defendants.              )    **AMENDMENT (42 U.S.C. §**
22                                   )    **1983)**
                                     ) **6. UNREASONABLE SEARCH IN**
23                                   )    **VIOLATION OF CAL. CONST.**
                                     )    **ART. I § 13 – (CAL. CIV. CODE**
24  _____)    **§ 52.1)**
25
26
27
28

                                    1

7. **UNREASONABLE SEIZURE/EXCESSIVE FORCE IN VIOLATION OF CAL. CONST. ART. I § 13 – (CAL. CIV. CODE § 52.1)**
8. **UNREASONABLE SEIZURE/FALSE ARREST IN VIOLATION OF CAL. CONST. ART. I § 13 – (CAL. CIV. CODE § 52.1)**
9. **DEPRIVATION OF RIGHTS IN VIOLATION OF CAL. CIV. CODE § 52.1**
10. **ASSAULT AND BATTERY**
11. **TORTIOUS INTERFERENCE WITH CONTRACT**
12. **DEPRIVATION OF DUE PROCESS IN VIOLATION OF 14TH AMENDMENT (42 U.S.C. § 1983)**

**DEMAND FOR JURY TRIAL**

2

FIRST AMENDED COMPLAINT

## I. JURISDICTION

1.      This Court has jurisdiction under 28 U.S.C. § 1331.  Federal question jurisdiction arises pursuant to 42 U.S.C. § 1983.

2.      This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because they arise under California state law, and are so related to the claims arising under federal law that they form part of the same case or controversy.

## II. VENUE

3.      The acts complained of arose within the Central District of California, therefore venue properly lies here pursuant to 28 U.S.C. § 1391.  One or more of the Defendants resides in or has its principal place of business in Orange County.

## III. PARTIES

4.      Plaintiff Lourdes Toman ("Lourdes") is approximately 54 years old and at all times relevant to this Complaint was a resident of Orange County, California. At the time of acts complained of herein, she was married to James Toman, who passed away on April 14, 2019.

5.      Plaintiff Antonio Paredes ("Paredes") is approximately 62 years old, and at all relevant times to this Complaint was Lourdes' roommate and a resident of Orange County, California.

6.      Plaintiff Alan Castro ("Castro") is Lourdes' son, approximately 20 years old, and lived with her at all times relevant to this Complaint. He is a resident of Orange County, California.

7.      Plaintiffs are informed and believe, and based thereon allege, that at all times material herein, Defendant Jerry Glomboske ("Glomboske") was a duly appointed and acting civilian investigator employed as such by the Brea Police

FIRST AMENDED COMPLAINT

Department, and in undertaking the acts of which Plaintiffs complain, Glomboske was acting within the course and scope of such employment and under the color of law. Glomboske is sued in his individual capacity.

8.      Defendant Brea Police Department ("BPD") is a law enforcement agency operating within the County of Orange, California. Defendant BPD is sued under a *Monell* theory.

9.      Plaintiff is informed and believes, and based thereon alleges, that at all times material herein, Defendants Davis Crabtree (#1467), Richard Herrera (#1260), Michael McCaskill (#1449), David MacShane (#1274), Detective Kevin Pedrosa, and Daniel Perez (#1547) (collectively "Fullerton Defendants") were duly appointed and acting police officers or employees employed as such by the City of Fullerton, and in undertaking the acts complained of herein, the Fullerton Police Defendants were acting within the course and scope of such employment and under the color of law. These defendants are sued in their individual capacities.

10.      Defendant Fullerton Police Department ("FPD") is a law enforcement agency operating within the County of Orange, California. Defendant FPD is sued under a *Monell* theory.

11.      The true identities of Defendants Does 1-10 ("Doe Defendants") remain unknown to Plaintiffs, but include other social workers and managers employed by the Orange County Adult Protective Services entity, and police officers employed by either Fullerton or Brea cities to the extent that these social workers or managers and police officers either caused, directed, participated in, or later ratified the conduct of other defendants discussed herein. These Doe Defendants were acting within the course and scope of their employment and under the color of law. The Doe Defendants are sued in their individual capacities.

12.      Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned below, each Defendant was the agent or co-conspirator of the

4

remaining Defendants, including Doe Defendants, and each other, and that in doing the acts alleged, each of the Defendants were acting within the course and scope of their agency, employment, partnership, conspiracy, or other authorized relationship with the other Defendants and with the permission and ratification of Defendants.  Whenever and wherever reference is made in this Complaint to any acts of Defendants, such allegations and references shall also be deemed to mean the acts of each Defendant acting individually, jointly or severally.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.    Plaintiffs mailed government tort claims putting these defendants on notice of the state law claims against them using the United States mail prior to October 2, 2019 to the City of Fullerton, the City of Brea, and the County of Orange pursuant to California Government Code § 910 et seq.  Government Code § 915.2(a) provides that timeliness of claims is determined by the date of deposit with U.S. mail. Both claims were denied within six months of the filing of this complaint.  Plaintiffs have exhausted all administrative remedies available to them.

## V. STATEMENT OF FACTS

14.    After decades of marriage, James Toman's first wife passed away on April 28, 2013.  In December 2015, he met Plaintiff Lourdes, and introduced himself to her. At that time, James was nearly ninety years old, and she was approximately forty years his junior.  From then on, Lourdes provided James with companionship, friendship, and they partook in daily life activities together including romantic dates, travel, errands, and entertainment. They developed a close relationship, which ultimately led to marriage on October 6, 2018.

15.    In January 2018, James sought legal assistance from John Bussman, California State Bar No. 265128, and went to the Orange County Superior Court to

5

obtained a restraining order against his daughter Margaret Jane Toman Grant ("Peggy"), who threatened James in December 2017; she had also assaulted Lourdes the previous year, in the summer of 2016. In April 2018, James and Peggy entered into a restraining order stipulation as proposed by Bussman.

16.     Also, on information and belief, James had not heard from or seen his son Kevin Toman in an estimated six years (except for a single card announcing an extended family member's death). Since 2015, there were minimal or no efforts by remaining family members to visit James or engage in a relationship with him. James told Lourdes and others repeatedly that he wished to change his will to leave his assets to her rather than to his children, and took all steps necessary to effectuate that decision, including a restatement of his trust and execution of a new will on December 12, 2018.

17.     Between December 2018 and February 2019, James' children began to accuse Lourdes of manipulating James' financial affairs.  This conflict resulted in at least two unsupported calls to 911 by Kevin, and repeated fraudulent and harassing requests for police "welfare checks" initiated by various parties including James' children, despite the absence of any evidence of danger to James' health or safety.

18.     On November 29, 2018, James met in person with real estate agent Lynne San Pedro (California Broker License No. 01400762) about selling his house located at 3338 Greenleaf Drive, Brea California 92823.  At that time, she could clearly see that he was intelligent, engaged, asking relevant questions, and in control of his faculties and his affairs.  San Pedro accepted James as a client and listed the Greenleaf property, and ultimately James entered escrow with Ricky Martinez and Associates Investments, Inc.  Simultaneously, James and Lourdes made an offer together on another home, located at 1473 Calle de Anza, Placentia CA 92870.  That sale was contingent on the sale of James' home; the owners of

FIRST AMENDED COMPLAINT

that property, Robert and Joyce Zurn, accepted that offer on January 22, 2019 and the property went into escrow.  But when San Pedro placed a for sale sign in front of the Greenleaf property, neighbor Carol Contreras reported the anticipated sale to Kevin and Peggy, with whom she was good friends.  Thereafter, San Pedro received a number of unpleasant and, on occasion, threatening phone calls, including from Defendant Glomboske.

19.   On January 14, 2019, James Toman signed and mailed a listing agreement to real estate agent Stephanie Yeaton in Maine to engage her to list his cottage at 101 Rocky Shore Lane, Oakland Maine for $429,000.  She did so on January 18, 2019.

20.   A few weeks later around the end of January, Glomboske called San Pedro and told her something to the effect of, her client was incompetent, that she could get in serious legal trouble if the house was sold, and that she could not proceed with the sale.  Although San Pedro believed that James was in his right mind, she was unsettled by the threats from Glomboske.  As a direct result of Glomboske's phone call, San Pedro cancelled escrow on the sale on the Greenleaf property.  As a result, the escrow on the new home which James and Lourdes wished to purchase together also had to be canceled.  Lourdes has not been able to buy that home, or any home, since that day.

21.   On February 28, 2019, Glomboske called Stephanie Yeaton to tell her to "immediately withdraw [James'] listing as he was investigating a dispute over Mr. Toman's affairs."  Thereafter, he called her a second time, on or before March 7, 2019, to tell her the same thing again.  On March 7, 2019, Yeaton emailed Lourdes and James to notify them that she would be withdrawing from the representation due to the harassing calls from various parties, including "the investigator," who she identified as Glomboske.  She mentioned that the buying

FIRST AMENDED COMPLAINT

season was just starting and that she already had several interested parties who were just waiting for the snow to melt to come and view the property.

22. The same neighbor, Carol Contreras, reported "elder abuse" to her friend, Christina Massini, who she knew, on information and belief, through her attendance at St. Andrews Episcopal Church. Massini is a social worker employed by the Orange County Social Services Agency (the "Agency").  Thereafter, sometime in or around early December 2018, Massini came to the Greenleaf property and left a card with her name and phone number indicating that she was a social worker who wished to speak with James.  Lourdes and James had already moved into Lourdes' apartment in anticipation of selling the Greenleaf house, but nonetheless contacted Massini and made an appointment so that she could come and interview James.

23. On January 29, 2019, Massini and another social worker, Ruth Ledesma, came to interview James at Lourdes' apartment located at 3106 Yorba Linda Blvd. Apt. B4, Fullerton, CA, 92831, where he lived.  They spoke with him alone for more than half an hour.  He signed a release of medical records while they were there, but later thought better of it. He expressed to Lourdes and others that he did not want the social workers to come back, because there was no need for their help, and that Massini had no need to know about his private matters. James thereafter took several actions in an effort to address his change of heart. He called Massini on three occasions, and left two voicemails for Massini, instructing her that she had no need to come back to visit him, that he did not need her social worker services, and to inform whomever asked for her services that he did not need such help. Soon after her visit, James called the Agency and also submitted a report complaining to the Agency about the overstepping by Massini.

24. Soon after his interview with Massini, James spoke in person with his doctor, Dr. Biren Shah (California Medical License No. A99596) at 955 W.

FIRST AMENDED COMPLAINT

Imperial Highway, Brea, to alert him not to release information to the Agency; Dr. Shah had already been contacted by Massini and released some records, but promised he would make a note of James' wishes in his file, and not provide Massini with any further records.  Around February 28, 2019, James began to feel more tired and lethargic than usual.

25.     On or prior to March 10, 2019, Glomboske requested to interview James on or about March 11.  On March 10, 2019, Lourdes' daughter, Cassie Doutt, responded to Glomboske through email to let him know that the family had found an attorney to be present, and that March 18 or 19 would both work as interview dates.  On March 11, Glomboske replied to say that neither date worked for him, and said: "Have James come in today.  He is not under investigation so there is no reason for an attorney."  Cassie replied the same day that perhaps Glomboske and the attorney could find a date that worked for both of them, and provided the attorney's name, phone number, and email address; Glomboske replied again that "I don't have the time to wait for your attorney.  Have James come in to see me today as was already scheduled."  He also told Cassie to stop contacting him about the case.

26.     On March 12, 2019, James was taken to the Hoag Newport emergency room on his birthday and hospitalized.  The doctors informed James, Lourdes, and Cassie that he needed surgery, but was not a candidate for such surgery due to his weak heart. The doctors informed Lourdes that James did not have long to live and the best choice was to move him into hospice care.

27.     On March 15, 2019, James was enrolled in home hospice care provided by Care Choices, a company based in Irvine. Towards the end of his life while he was in home hospice care, Lourdes and her family provided him 24-hour care, including maintaining hospice nurse appointments, cooking for him, feeding

FIRST AMENDED COMPLAINT

him, bathing him, changing his diapers, and emotionally supporting her husband's end-of-life transition.

28.     On March 18, 2019, at 10:17 a.m., Glomboske emailed Cassie asking her to have James give him a call, despite his earlier instruction for her not to contact him about the case.

29.     On March 20, 2019, Cassie called Glomboske to inform him that James was in home hospice and bedridden and was not able to meet that day, and to provide alternate dates for the interview. Cassie also informed him that she would need to be present for the interview, but Glomboske did not agree and by 10:28 a.m., announced he would be coming to the residence that day.  Thereafter, Glomboske arrived at Lourdes' apartment with at least two other BPD employees to interview James Toman and further investigate whether Lourdes was somehow abusing him.

30.     Glomboske made no attempt to get a warrant and did not have one when he arrived.  However, Lourdes allowed him to come in, and the investigators spoke with James for about half an hour or more. They left without stating or otherwise implying that they had found anything wrong with James' living situation or safety. When Glomboske asked if there was anything he could do for James, James responded that there was nothing he could do or wanted from him. Glomboske did not indicate to Lourdes that she needed to change anything about James' care or living environment, or that she needed to address any concerns of any person at all.

31.     After completing his interview with James, Glomboske told Lourdes that James' son Kevin wanted to see James.  Lourdes scoffed, saying something like, "After six years?  I don't think so.  And I don't think James wants to see him."  Glomboske insisted that James had said he wanted to see Kevin.  Lourdes agreed to have James meet with Kevin, but stated she did not feel comfortable

FIRST AMENDED COMPLAINT

having Kevin inside her home and asked that Glomboske tell Kevin to contact her to make an appointment rather than giving Kevin her home address.  Shortly thereafter, Cassie emailed Glomboske asking him again not to give Kevin their address, but that Kevin could email her to make an appointment.  Glomboske gave Kevin the address anyway, and gave no warning to Lourdes or James that he had done so.

32.     On the morning of March 23, 2019, Kevin Toman arrived at Lourdes' apartment without notice. Lourdes was in the middle of changing James' diaper, and told Kevin that he could not see James right then, but that they could go somewhere in the next hour or so to meet him for breakfast.  Kevin did not respond appropriately to this by leaving; instead, he sat down in front of the apartment door. After a while, he walked around the side of the apartment building and appeared as if he were considering jumping the fence to get into her back patio area where the back door was.  He was very aggressive and rude in his demands to see James, and threatened to call the police on Lourdes for "kidnapping" his father.

33.     Lourdes immediately called Cassie, who was en route to Lourdes' home, and told her what was happening. Cassie called the Fullerton police to inform them that Kevin Toman was behaving menacingly and asked that the police come to the home to protect them from Kevin. Cassie then called Song Richardson, the dean of UC Irvine School of Law.  Richardson advised that Cassie's family should not let anyone in without a warrant. When Cassie arrived at her mother's home, she saw Kevin leaning up against the backyard fence peering into the side window. When Lourdes and Cassie opened the patio door to discuss with Kevin his presence, he told her from there in a menacing tone, "Lourdes, your time is coming to an end."  Cassie told him that if he was going to make threats and act that way, they would ask him to leave.  Meanwhile, Lourdes had no idea what he meant by that and believed he was threatening her life. Lourdes had a reasonable

FIRST AMENDED COMPLAINT

fear of James' children because in 2016 Peggy Toman had attacked her, and leading up to Peggy's restraining stipulation in 2018, Peggy had been threatening to both Lourdes and James. For these reasons, the family called the Fullerton Police, who later arrived at the home and said they could not do anything about Kevin's threat because it was not clear enough.  On information and belief, FPD did nothing to make a note of the interaction to alert future officers who might be called to another disturbance at the same location, but the call for service was recorded and available to anyone who chose to investigate – such as Glomboske.

34.     After the police left the home, Cassie asked James if he wanted to see Kevin; James said he did not understand why Kevin was there at all and said, "Why now? He hasn't been there all this time."  Eventually James said he was willing to see Kevin to find out what he wanted, so Lourdes allowed Kevin into her home to meet with James, warning him that he would be asked to leave if he threatened anyone in the family again. Kevin's presence was difficult for James in his ailing state, and he was highly emotional.  Kevin pressured James to meet with Peggy, and James agreed, despite the restraining order stipulation. Kevin also asked if James was willing to meet with Kevin alone, but James said that he wanted Lourdes and Cassie to be there.  Neither James nor Lourdes wanted Peggy at the apartment, so Lourdes agreed to bring James to meet Peggy and Kevin at a nearby Marie Callenders restaurant the next morning at 10:30 am.

35.     At 5:20 p.m. on March 23, 2019, Cassie emailed Glomboske to inform him that Kevin had come to the property unexpectedly and to ask that Glomboske not give out the family's address to any other parties.  She further informed Glomboske that Kevin had been able to see his father and that there was a meeting scheduled for the following day with Peggy.

36.     The next day, March 24, 2019, at 10:30 am, Lourdes, James, Cassie, Alan Castro (Lourdes' son), and Tremayne Wilson all met with Peggy and Kevin

FIRST AMENDED COMPLAINT

Toman at Marie Callenders at 126 Yorba Linda Boulevard, Placentia, California, 92870.  James was tired and did not really want to see Peggy or visit with anyone that morning.  In fact, he was adamant that he wanted to stay home and did not want to cooperate in leaving the home. However, Lourdes kept the appointment out of goodwill, even though it stressed James.  Kevin quickly began claiming that James was very sick and that his vital signs were alarming, and called 911 insisting that James needed to go to the Emergency Room. However, the night before, the hospice nurse had checked James' vitals, and when Cassie and Lourdes checked his vitals that morning he was stable.  Nonetheless, they did not object to the paramedics call. When the paramedics came, Kevin claimed to be a medical doctor, although he is not. Kevin claimed that James was overmedicated, and the paramedics inquired into the subject; Lourdes and Cassie disclosed that the hospice nurse managed James' medications; Kevin heard this information.  Kevin directed the paramedics to take James to the emergency room and that he didn't care how much it would cost to do so. When the paramedics asked who had power of attorney and Lourdes disclosed that she did, Kevin was disgruntled and began to disparage Lourdes and her relationship with James. The paramedics declined to take James to the hospital because doing so would have terminated his hospice care, and because he was stable.  The paramedics explained the purpose of hospice care to Kevin, and allowed Lourdes to take James home.  Later that day, Cassie emailed Glomboske about the visit so that he could stay informed, and she disclosed that Kevin had called paramedics unnecessarily.  She also informed Glomboske that the paramedics had found James' vital signs to be normal and allowed Lourdes to take him home.

37.     After taking James home, Lourdes and Cassie went to check on the Greenleaf property, where they saw Peggy, who was legally restrained from coming within a certain distance of the property.  Lourdes and Cassie called the

FIRST AMENDED COMPLAINT

Brea Police, who responded.  At the scene, Lourdes and Cassie explained that there were allegations that Glomboske was investigating, so the responding officers called Glomboske and, in turn, explained the whole situation to him.  Glomboske then instructed the responding officers not to let Lourdes and Cassie into the Greenleaf property, asserting they had no right to be there.  Although Lourdes had a valid power of attorney, signed by James and notarized by a licensed notary public, Glomboske asserted that it was not valid because it had not been approved by a court.  In fact, documents conferring power of attorney need not be approved by a court to be valid.  As a result of Glomboske's directions, the responding officers did not allow Lourdes and Cassie to enter the house on their own; ultimately, one of the officers reluctantly escorted them through the property so they could ensure nothing had been taken or broken, and that no one had illegally entered the premises.

38.    On March 25, 2019, Glomboske responded to Cassie's emails about Kevin's threatening visit to the home, the disastrous visit with Peggy, and the paramedics.  He said "I just got your emails and have had many calls this morning regarding this issue."  He did not apologize or comment on any of the events, but again asked her to provide the family's private documents, such as Lourdes and James' marriage certificate.

**ASSERTION OF RIGHTS AND WARNING**

39.    On March 25, 2019, Lourdes retained an attorney, Michael Fell (California State Bar No. 144137), to protect her from aggressive and occasionally hostile family members, not to mention a possible criminal investigation by Glomboske.  Fell made contact with Glomboske to discuss the situation and inform him of all the facts; specifically, that James' family appeared to be trying to use the Brea Police Department to harass Lourdes, that James was in good hands and good condition with Lourdes, and that he was in the care of hospice personnel, who were

14

monitoring his health regularly.  On the same day, Fell emailed Glomboske to alert him that he had been retained to represent Lourdes and Cassie.  Fell stated, "Please feel free to reach out to me at your convenience on any of the numbers listed below.  I would be happy to go through with you any questions you have in regards to my clients."  Glomboske never called Fell.

40.     Glomboske responded via email on March 26, and the two discussed getting him the documents he had requested.  On that same day, Glomboske attended a meeting with Detective Pedrosa of the Fullerton Police Department and discussed the case.  It was decided at that meeting that Pedrosa would attempt to perform a welfare check on James Toman; on information and belief, Glomboske failed to disclose that he had visited James on March 20, that he had found nothing amiss, that the family had James on hospice care, that the family had retained an attorney, that the attorney had offered to answer any questions Glomboske had, or that Glomboske had not made any attempt to ask the attorney any questions about James, the family, or hospice care.

41.     On March 27, Fell emailed to ask Glomboske, "Will you have a chance to chat with me tomorrow about this case?"

42.     On March 28, Glomboske replied, "I'm super busy today but if you want to email me maybe I can answer your questions?"

43.     On March 29, 2019, Detective Pedrosa from the Fullerton Police Department, along with Fullerton police officer Corporal L. Garcia, #1381, a social worker, and Dr. Sandra P. Klein, a psychologist with UC Irvine Health, went to Lourdes' apartment.  They stated they had been sent by Glomboske to perform a "welfare check" and believed that James was "overmedicated."  They did not state the basis of their belief that he was overmedicated, or any other basis for needing to check his welfare.  Glomboske had known since March 20 that James was on hospice care.  He never said anything about James being overmedicated to Fell,

FIRST AMENDED COMPLAINT

Lourdes, Cassie, or anyone else connected with the family, and on the one occasion he had personally seen James, had not asked him anything about his medication, had not asked Lourdes or Cassie to show him what medications he was on, and had not called any medical professional to come and evaluate James to see whether he appeared to be overmedicated.  He had never, on information and belief, asked Lourdes, Cassie, or Fell for the contact information of the hospice workers who oversaw James' treatment.

44.     By this time, Lourdes had been told by Glomboske that he was just checking to make sure James was okay on March 20; she had allowed Kevin Toman to check on his father and make sure he was okay on March 23; on March 24, she had watched paramedics come to check on James, only to confirm that he was okay; and was now being told by an entirely new group of people with Fullerton Police Department that they needed to check and make sure James was okay again.  She had also been advised by multiple attorneys and her children not to let police in without a warrant.  Lourdes called her attorney, Michael Fell, and informed Pedrosa and the other people outside her door that she was not supposed to have any medical personnel see James except the ones working for his hospice agency.  Detective Pedrosa asked to speak with her attorney, and so Lourdes handed him her cell phone.  On the phone with Fell, in the presence of Lourdes, Pedrosa stated that he was there because there was a concern that Lourdes was trying to sell the Greenleaf property. Fell questioned whether Pedrosa's visit was really a "welfare check" or if it would more appropriately be considered a civil matter between the families. Pedrosa then stated that the matter could be criminal if she were abusing James financially and that her refusal to allow them entry might constitute criminal obstruction.  Lourdes heard what Pedrosa said and chose to exercise her constitutional right to refuse entry to her home without a warrant.

16

FIRST AMENDED COMPLAINT

After around 12 minutes on the phone with Fell, Detective Pedrosa and the people with him left, saying they would come back with a warrant.

45.     Detective Pedrosa also made other statements, betraying either a failure to understand or a failure to respect Lourdes' Fourth Amendment rights to be free from unreasonable searches, or warrantless searches not subject to any recognized exception to the warrant requirement.  For example, he said **"I understand that... we don't have a warrant, I get that part"** but failed to articulate any exception to the warrant requirement in his argument for why he should be allowed to enter the home to check on James' welfare.  He admitted, **"We talked to hospice… [and they said] 'Two days ago I saw him, he's fine…', however I'm standing at the door right now and I'm literally being (unintelligible) at the door by someone saying 'No, you're not going to come in my house.'"**  When it became clear that Pedrosa had no probable cause to believe that James' health or physical safety was in imminent danger justifying a warrantless entry, he switched tactics and insinuated that the mere possibility of Lourdes having committed a crime would justify entry: **"This individual at the front door here is trying to sell real estate, and for all we know, this could be a criminal matter that she's preventing us from investigating."**  Fell pointed out that this was not a criminal matter suitable for police intervention, but rather a civil matter between the families.  Pedrosa then revealed his belief that it was Lourdes' burden to "disprove" the allegations: **"Everyone's got their right, I get that, but however if I… wanted to disprove these allegations, I'd (unintelligible) you know what, (unintelligible) everything you want, okay, talk to this person. That's … my mentality."**

46.     The other officer present told Lourdes: "There's a good chance that if we leave here today, we will be able to get a warrant."  Lourdes said that would not be a problem.

FIRST AMENDED COMPLAINT

47.     While Fell and Pedrosa discussed the situation over the phone, Dr. Klein bullied, insulted, and threatened Lourdes.  She demanded to see Lourdes and James' marriage certificate, and when Lourdes refused and asked for Dr. Klein's business card, she responded, "You want everything from us but you don't want to cooperate" and essentially argued that if Lourdes would not believe she was who she said she was, then she could not believe Lourdes when she said she was James' wife – disregarding the fact that she was the one standing outside a stranger's front door rudely demanding entry without a warrant.  Dr. Klein further said that if Lourdes really wanted to protect James, she would allow them in, and telling her that she was not protecting James, she was protecting herself.  She also said "You do understand that you're going to be fully responsible for everything?"  When Lourdes asked her to clarify, Dr. Klein said, "For any kind of difficulty that could happen here with your husband."  Lourdes did not know what she meant but did not allow the four strangers into her home, and they left shortly after Dr. Klein's statements.

48.     One of the last things Pedrosa said to Fell over the phone was: **"What we'll do, if we're not going to be allowed in, we'll just come back with a warrant, and unfortunately that's just the way it's going to have to be."** Pedrosa did not specify why it would be "unfortunate" if he had to comply with the law.

49.     Shortly after Detective Pedrosa and the rest of the Fullerton police officers left the property, Michael Fell emailed Glomboske, the lead detective on the case, to register his concerns with the repeated and unsupported welfare checks, and copied the deputy district attorney in charge of the case.

50.     Glomboske was aware that there were several issues in the case that presented a risk of intrusion, harassment, rights violations, and injury to Plaintiffs. Specifically, he was aware of: an ongoing civil dispute between James' children

FIRST AMENDED COMPLAINT

and his much younger wife, Lourdes; the children's allegations of medical and financial abuse of an elder or dependent adult; and his own open criminal investigation.

51.     Even though BPD was handling the investigation, Glomboske knew that because the family was living in Fullerton, Fullerton was likely to be involved – such as for welfare checks, a highly predictable occurrence in a family dispute involving allegations of abuse.

52.     In fact, Glomboske himself intentionally involved Fullerton, by requesting that FPD perform a welfare check on James Toman.

53.     However, Glomboske failed to follow up thereafter and keep Fullerton informed as to the progress of the investigation so that future calls for service to the address could be informed by all of the relevant facts and circumstances; he also failed to take advantage of the information readily available to him as an investigator, such as records of calls for service to FPD involving the family residence.

54.     Glomboske did not inform Fullerton of Michael Fell's email communications, the fact that James Toman was under hospice care and that the family was willing to provide the hospice workers' contact information through counsel, or that he had conferred with the District Attorney's Office and learned that there would be no way to gain entry to the residence to perform an assessment of James Toman without a warrant.

55.     Brea Police Department utilizes a case management system that Glomboske used to keep track of his activity in this case.  Although Glomboske documented his conversations with Lourdes' daughter, Cassie, with real estate agent Lynne San Pedro, with James' daughter Colleen, and with various agencies, he documented nothing regarding his own visit to the property to meet with James, and nothing about Michael Fell's communications or the facts contained therein.

FIRST AMENDED COMPLAINT

Until April 2, he also documented nothing about Pedrosa's visit to the residence, or the fact that Lourdes had refused to allow entry without a warrant.  Between March 20, 2019 and April 2, 2019, Glomboske made no entries at all, even though Pedrosa stated to Lourdes on March 29 that he had been sent by Glomboske to conduct a welfare check.

56.     On information and belief, Glomboske did nothing to share the information provided by Fell with Fullerton, nor to make any note about the fact that Plaintiffs were represented by counsel, that there was an ongoing criminal investigation and possible civil dispute, or that Plaintiffs were known to refuse to allow officers in to conduct welfare checks without a warrant.

57.     On information and belief, although Pedrosa identified himself at the location as having been sent by Glomboske when he demanded entry, he did not thereafter contact Glomboske to inform him that FPD had made an attempt to conduct a welfare check on James Toman or report that the attempt had been unsuccessful due to the family exercising their constitutional right to be free from warrantless searches of their home.

58.     Pedrosa likewise did not take steps to create a Computer Aided Dispatch alert ("CAD alert") noting that the family was being investigated for possible criminal elder abuse, that the family was represented by counsel, that the family had refused entry without a warrant, and that he had determined that a warrant would be necessary based on the information available to him as of March 29.  Such information could have been made visible to all responding officers called to the location thereafter if Pedrosa had created a CAD alert.

59.     On information and belief, neither FPD nor BPD have policies in place requiring officers and detectives to document or share information about an address that has had a welfare check request; an address with occupants who deny entry without a warrant; an address that is under criminal investigation; an address

20

that appears to have an ongoing dispute between occupants or between occupants and third parties; an incident of forced entry; or any other information about a particular address.  Thus, the occupants and any officers who respond in the future are placed at risk unnecessarily.

### **UNLAWFUL ENTRY**

60.    On April 2, 2019, the Fullerton Police Department arrived at the family's door again, this time with officers Crabtree and MacShane around 3:28 p.m. They asked if James was there and identified themselves as the Fullerton Police Department, wanting to perform a welfare check.

61.    Lourdes immediately contacted Michael Fell again, who asked her to give his phone number to the officer requesting entry (Fullerton Corporal MacShane, badge number #1247).

62.    When Lourdes verbally attempted to give MacShane Fell's number, MacShane stated that he was not interested in talking to him. Lourdes advised MacShane that her lawyer was on his way and inquired as to whether FPD had a warrant.

63.    At 3:39 p.m., Crabtree asked someone at FPD to send a sergeant to the location due to the occupants' refusal to allow the welfare check.  Defendants Herrera and Perez, who are officers but not sergeants, arrived at around 3:48 p.m.

64.    At 3:53 p.m., Defendant McCaskill, a sergeant, arrived.  MacShane and Crabtree briefed Sergeant McCaskill on the fact that they had been called to do a welfare check on a man in his 90's, the occupants were refusing entry, there were accusations of elder financial abuse of the 90 year old man by a female occupant named Lourdes; Lourdes lived at the property; Lourdes and James had a consensual relationship in years past; BPD was involved on an open criminal investigation; and the reporting party, the son, had last seen his father the Sunday prior to the call.

FIRST AMENDED COMPLAINT

65.     At about 3:55 p.m. Sergeant McCaskill decided to force entry and arrest occupants for violation of Penal Code § 148, citing the following factors: MacShane and Crabtree had confirmed that James lived at the location; James was in his 90's; FPD needed to perform a welfare check; and they were not being allowed in.

66.     At about 3:56 p.m., Corporal Crabtree knocked and demanded to enter the apartment to perform a "welfare check" on James.  Within about ten seconds, Lourdes' daughter, Cassie Doutt, spoke to them through the Ring video camera installed on the door, telling them that their lawyer was on the way.  They responded and said they had a "lawful duty" to check the welfare of Mr. Toman, and that there was no warrant and there did not need to be a warrant, and that it was fine if her attorney was on his way, but that the occupants needed to open the door, or all individuals inside who did not open the door would be arrested.

67.     Doutt immediately responded, "Okay," told them that she was also on her way and that she was going to try to get her mom on the line, "So give me a second, please."  Without waiting, MacShane then attempted to use a key to open the apartment door and shouted, "Open the door you're gonna go to jail".  However, the key did not work.  Within ten seconds of giving up on the key, he began kicking the door down, which took approximately seven seconds.  All told, the Fullerton officers spent less than 90 seconds from the time they knocked to the time they began kicking the door in.  Crabtree did not even get Mr. Toman's name right: he called him Mr. Coman.  Just before MacShane began kicking the door down, Lourdes asked "Do you have a warrant?" from just inside the front door; MacShane responded, "We do not, we're going to kick the door down though." Seconds later, MacShane started kicking the door down.

68.     The above-named officers broke down Plaintiffs' front door and entered illegally, rather than wait for Lourdes' attorney to see if there was any

alternative to force.  As they entered, Lourdes and her son Alan were standing side by side just on the other side of the door.  Lourdes is 5'6" and in her fifties; she was holding nothing in her hands at the time the officers entered.  Alan is 6'3" and 20 years old, and was holding his phone at the time.  MacShane immediately grabbed Lourdes and dragged her out of the apartment by her neck and arms along with McCaskill, and her elbow and toe were broken in the process as well as incurring other soft tissue injuries; Lourdes began screaming in pain, screaming to the officers "You're breaking my arm."  By contrast, Castro was given the opportunity to cooperate, and told to put his hands behind his back, which he did without complaint or resistance.  He is shown on video calmly being escorted out of the apartment unharmed.

69.     Crabtree, who escorted Castro out of the apartment, was directly behind MacShane when he grabbed Lourdes.  Crabtree was the only one in position to view the interaction.  He deliberately turned his FPD-issued bodyworn camera off right as MacShane began violently assaulting Lourdes, and turned it back on eleven seconds later as he escorted Castro out through the front door of the apartment.  This is a violation of FPD camera policy 470.4.1(a), which requires recording during all field contacts and calls for service through the entire contact or until otherwise directed by a supervisor.

70.     Antonio Paredes, another occupant of the apartment, was lying down on the bed in his bedroom when officers entered the room searching for other occupants.  Officer Herrera told Paredes to stand up and put his hands behind his back, which he did, and Herrera peacefully handcuffed and escorted him out of the apartment.  Paredes made no move to resist, and did not argue.  It is clear from the calm manner in which he was escorted out of the apartment, which was captured on video, that he cooperated fully.

FIRST AMENDED COMPLAINT

71.     Less than four minutes later, Lourdes' attorney Michael Fell arrived. The police had never even asked how much time he needed to get to the apartment, or indicated that they would be willing to speak with him if he did arrive.

72.     Having broken down the door, injured an older woman, handcuffed three innocent people, and unlawfully entered a dwelling without a warrant, the police then interviewed James.  They found nothing to indicate that Lourdes had done anything wrong. Within ten minutes of the forced entry, Cassie Doutt arrived on the scene. She arrived as Officer Perez was putting Lourdes into the police car. Finding nothing to support any crime or concern for James' welfare, the officers left James at the apartment in Cassie's custody, because she had power of attorney. They never showed any remorse or apologized, instead blaming Lourdes for not opening the door.

73.     Despite the absence of unlawful resistance by all Plaintiffs, Fullerton police arrested all three for violation of California Penal Code § 148(a), resisting, delaying or obstructing a peace officer in the lawful performance of his or her duties, and transported them all to the Fullerton Police Department, and detained them there for over an hour before releasing all three without charges.

74.     Meanwhile, just moments before Fullerton decided to force entry, Glomboske made two entries in the Brea Police Department's case management system.

75.     At 3:37pm on April 2, 2019, Glomboske entered: "Review with Elder Abuse case study took place on 3/26/19.  At that time it was decided that DR Kline and her team would go to the apartment to do an accesment (sic) of Mr Toman. They went to that location on 3/29/19 with Det Pedrosa from Fullerton and were denied access per their attorney on the phone, Mike Fell who said they needed a search warrant."

FIRST AMENDED COMPLAINT

76.     At 3:39pm on April 2, 2019, Glomboske entered: "Met today with the elder abuse team at their Orange County office to update the case. Requested that I contact the DA to find out what can be done to get access to the apartment to do an accessement (sic).  Per the DA nothing can be done except (sic) to get a search warrant for records for the case to include the location and bank records."

77.     After Lourdes was released from custody, she immediately went to St. Jude Fullerton hospital, and was treated for her injuries, which included a fractured left elbow, fracture of her right fifth toe, low back, chest and rib pain.  She was recommended to have twelve follow-up visits with a physical therapist, but due to payment delays with her sixty-day emergency insurance and her inability to pay out of pocket for the visits, she was only able to go twice before the insurance expired.

78.     Later, on the same day, Sereena Ortiz-Castro, Lourdes' younger daughter, called into the station to speak to Lieutenant Hines (the main officer in command), and he said that he was "embarrassed," and that the officers should not have acted that way (call incident number #19-19382).

79.     However, on information and belief, none of the officers were disciplined, counseled, or required to undergo any sort of training to correct deficiencies in their decision-making.

80.     Mere days later, on April 14, 2019, James passed away.

81.     Lourdes remains traumatized by this incident and fearful of the police, who caused her lasting emotional damage and documented physical injuries requiring emergency treatment and physical therapy.  This incident has prevented her from calling police on at least one occasion when she otherwise would have due to her fear that they would harm her rather than help her; in addition, she continues to fear persecution by police and is afraid when any of her children drive into Fullerton, Brea, or Placentia in case they are stopped by police there.  In

FIRST AMENDED COMPLAINT

addition, Lourdes still has pain and slightly limited range of motion in the elbow McCaskill and MacShane broke.  She still remembers the sequence of events as though it happened yesterday.  This incident robbed her of the dignity she deserved while dealing with the impending death of her husband, and has had a lasting impact on Lourdes.

82.    Antonio still suffers from a lingering fear when he sees police that they may be following him.

83.    Alan is still emotionally distressed by the memory of seeing his mother be attacked and hurt in front of him while he was helpless to stop the violence against her.  All three Plaintiffs continue to suffer impacts from the actions of Defendants.

# V. CLAIMS
## FIRST CLAIM FOR RELIEF
### MONELL VIOLATION
### (All Plaintiffs Against FPD and BPD)

84.    Plaintiffs Lourdes Toman, Antonio Paredes, and Alan Castro reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 83.

85.    On information and belief, Defendant Fullerton Police Department and Defendant Brea Police Department each have an unconstitutional policy, pattern or practice of (1) failing to train their employees as to the appropriate grounds to conduct a welfare check; (2) failing to train their employees as to when a request for a welfare check justifies forcing entry to a residence; and (3) failing to require officers to communicate and document relevant information about addresses that have been visited by police so that future visits are informed about the recent history of police interactions.  This allows 911 callers to utilize a police

FIRST AMENDED COMPLAINT

department as their own private intimidation force to harass and unnerve opponents in custody battles, civil lawsuits, and other disputes.

86.    In fact, Fullerton Police Department has no policy regarding welfare checks at all, even though all police departments are required by state law to have a written policy regarding welfare checks.  As a result of Fullerton Police Department's unconstitutional policy, pattern or practice, Pedrosa (1) failed to appreciate that he was being asked to conduct a welfare check that was not legally justified; (2) failed to understand that a person who refuses officers entry without a warrant on the advice of a lawyer is not criminally obstructing an investigation; and (3) failed to communicate to the April 2 responding officers (McCaskill, MacShane, Crabtree, Herrera, Perez) that Lourdes was under criminal investigation for elder abuse, was represented by counsel, and had a history of refusing entry for welfare checks without a warrant, or that he had said he would return with a warrant.  The April 2 responding officers also had no idea that officers from their department had just been to the address on a welfare check five days prior.  And as a result of FPD's failure to train, none of the April 2 officers realized that they had no legal right to force entry to conduct a welfare check.

87.    The April 2 responding officers justified using force to enter the property by saying that they did not know any of the history that had occurred on March 29 or other background information about the case, the property, or its occupants.  Defendant McCaskill admitted that a CAD alert could be created to inform responding officers about the unsupported welfare checks being requested at the address, but there is no policy requiring FPD officers to do so.  Plaintiffs are unaware of whether any such alert was in fact created thereafter, but complain of FPD's lack of a requirement or policy, or any departmental guidance at all, to ensure that the alerts are created when appropriate.

88.    In addition, on information and belief, FPD has failed to adequately train its officers to correctly recognize that a welfare check request, without more,

27

FIRST AMENDED COMPLAINT

does not justify forced entry where there is no consent, no warrant and no articulable exigent circumstance justifying warrantless entry.

89. On information and belief, BPD does not have a policy directing elder abuse investigators to ensure that they inform other involved agencies or law enforcement agencies with jurisdiction over victims and suspects in their cases of the progress of the investigation, as may be necessary to protect the rights of the accused. For example, on information and belief, family disputes about changes to a beneficiary's right to his or her inheritance often result in accusations of undue influence or elder abuse, and requests for welfare checks. Plaintiffs are informed and believe that it is foreseeable that an officer conducting a welfare check may not be aware that there is an open criminal investigation targeting the party responsible for the welfare of the person being checked on.

## SECOND CLAIM FOR RELIEF
## UNREASONABLE SEARCH IN VIOLATION OF FOURTH AMENDMENT
### (All Plaintiffs Against Defendant Glomboske and Fullerton Defendants)

90. Plaintiffs Lourdes Toman, Antonio Paredes, and Alan Castro reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 83.

91. On April 2, 2019, Fullerton Defendants Crabtree, Herrera, McCaskill, MacShane, Perez, and Salazar unreasonably searched Plaintiffs' home without consent, without a warrant, and without a warrant exception, which violated their Fourth Amendment rights. These Defendants had no warrant and no applicable exception to the requirement for a warrant; they knew they needed a warrant and stated they would get one; and yet returned, having made no attempt to get a warrant, and forcibly entered Plaintiffs' home, causing damage to the front door and emotional distress and humiliation to Plaintiffs.

92. Defendant Pedrosa and Defendant Glomboske both failed to communicate and document their interactions at Plaintiffs' home, which

foreseeably resulted in additional police visits and the constitutional violations described by the remaining Fullerton Defendants herein.

93.   The above-described actions of Defendant Glomboske and all Fullerton Defendants deprived all Plaintiffs of their rights under the Fourth Amendment of the United States Constitution to be free from unreasonable searches.

94.   All actions by Glomboske and all Fullerton Defendants herein complained of were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Brea or the City of Fullerton, and at all times, Glomboske and the Fullerton Defendants were acting under color of law.

95.   Pursuant to 42 U.S.C. 1983, Plaintiffs are entitled to claim for damages for the deprivation of their rights under the Fourth Amendment to the United States Constitution.  Defendant Glomboske and Fullerton Defendants' conduct caused Plaintiffs damages in an amount to be proven at trial.  Plaintiffs experienced significant emotional distress as a result of Defendants' actions. Plaintiffs are entitled to compensation for the emotional distress they experienced as a result of Defendant's conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Fullerton Defendants' actions were malicious, willful, committed with the specific intent to deprive Plaintiffs of their rights, and/or in conscious disregard for Plaintiffs' rights.

## THIRD CLAIM FOR RELIEF
## EXCESSIVE FORCE/UNREASONABLE SEIZURE IN VIOLATION OF FOURTH AMENDMENT
### (Plaintiff Toman Against MacShane and McCaskill)

96.   Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 83.

FIRST AMENDED COMPLAINT

97.    On April 2, 2019, Defendants McCaskill and MacShane attacked Plaintiff Lourdes Toman while she was unarmed, barefoot, and standing peacefully inside her own home, when they had no warrant, no consent, and no applicable exception to a warrant to justify warrantless entry.  McCaskill and MacShane forcefully seized Plaintiff and dragged her out of her own home, breaking her elbow and right fifth toe, and injuring her lower back, chest and ribs in the process, and causing other soft tissue damage.

98.    McCaskill and MacShane had no right to seize Plaintiff Lourdes Toman, nor use any force on Plaintiff Lourdes Toman, nor to enter her home, thus, any force at all would have been excessive.  However, even if McCaskill and MacShane had the right to enter the home by force, Plaintiff was not a threat and was not behaving in a manner that justified grabbing her with enough force to break her elbow.  Even if McCaskill and MacShane had been justified in breaking down the door and entering forcibly (which they were not) they then should have assessed the situation for potential threats.  Upon seeing that the occupants were standing calmly without weapons and barefoot or in sandals, McCaskill and MacShane should not have seized them or used any force.  The force actually used was excessive even without considering that McCaskill and MacShane had no underlying right to enter the home.  Alternatively, if only one of the two Defendants used excessive force on Plaintiff Toman, then the other failed to intervene to stop him from hurting her unreasonably.  In addition, after Lourdes was handcuffed with her hands behind her back and seated upright in the hallway, McCaskill grabbed her by the handcuffs and dragged her backwards a short distance, placing great strain on her already injured elbow, as she cried, "You're hurting me."  There was no reason she needed to be moved, much less dragged, and after she had told them, "You're breaking my arm," the act of dragging her by handcuffs was excessive and cruel.

FIRST AMENDED COMPLAINT

99.    The above-described actions of McCaskill and MacShane deprived Plaintiff of her right under the Fourth Amendment of the United States Constitution to be free from unreasonable seizures.

100.    All actions herein complained of by McCaskill and MacShane were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Fullerton, and at all times, Fullerton Defendants were acting under color of law.

101.    Pursuant to 42 U.S.C. 1983, Plaintiff Toman is entitled to claim for damages for the deprivation of her rights under the Fourth Amendment to the United States Constitution.  The conduct of McCaskill and MacShane caused Plaintiff Toman damages in an amount to be proven at trial.  Plaintiff Toman experienced significant emotional distress as a result of the actions of McCaskill and MacShane.  Plaintiff Toman is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Defendants' actions were malicious, willful, committed with the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

## FOURTH CLAIM FOR RELIEF

**UNLAWFUL ARREST/UNREASONABLE SEIZURE IN VIOLATION OF FOURTH AMENDMENT**

**(All Plaintiffs Against Defendants Crabtree, Herrera, McCaskill, MacShane, Perez, and Salazar)**

102.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 83.

103.    Fullerton Defendants Crabtree, Herrera, McCaskill, MacShane, Perez, and Salazar further unreasonably seized and unlawfully arrested all three Plaintiffs

31

by handcuffing them, removing them from their home, and taking them to the police station and detaining them there for a lengthy period of time, believed to be at least one hour, before releasing them without charges.

104.   None of the Plaintiffs appeared to be a threat to any Fullerton Defendant, nor offered any resistance at all to any Fullerton Defendant.  Although Plaintiff Lourdes Toman responded verbally to the break-in and was emotionally upset by the whole situation, she did not physically resist or threaten officers in any way to justify any arrest or detention for a criminal charge.  Alan Castro and Antonio Paredes were calm and cooperative and did not argue, yet they were arrested and detained anyway.

105.   Fullerton Defendants did not simply handcuff and remove Plaintiffs to secure the scene so that they could safely conduct the welfare check.  They handcuffed them, left them outside while they completed their investigation, and then transported them to the police station.  Even once at the police station, no Fullerton Police officer or supervisor intervened to insist that Plaintiffs be released immediately, despite Michael Fell having arrived on-site and explained the whole situation to McCaskill, who could have taken steps to contact Pedrosa and/or Glomboske before deciding to transport and arrest Plaintiffs.  Plaintiffs were detained for over an hour at the station until finally released – but Defendants offered them no transport to get home.

106.   The above-described actions of the Fullerton Defendants deprived all Plaintiffs of their rights under the Fourth Amendment of the United States Constitution to be free from unreasonable seizures.

107.   All actions herein complained of by Fullerton Defendants were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Fullerton, and at all times, Fullerton Defendants were acting under color of law.

FIRST AMENDED COMPLAINT

108.   Pursuant to 42 U.S.C. 1983, Plaintiffs are entitled to claim for damages for the deprivation of their rights under the Fourth Amendment to the United States Constitution.  Fullerton Defendants' conduct caused them damages in an amount to be proven at trial.  Plaintiffs experienced significant emotional distress as a result of Defendants' actions.  Plaintiffs are entitled to compensation for the emotional distress they experienced as a result of Defendant's conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Fullerton Defendants' actions were malicious, willful, committed with the specific intent to deprive Plaintiffs of their rights, and/or in conscious disregard for Plaintiffs' rights.

## FIFTH CLAIM FOR RELIEF

### RETALIATION IN VIOLATION OF FOURTH AMENDMENT

**(Plaintiff Toman Against** McCaskill and MacShane**)**

109.   Plaintiff Toman realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 83.

110.   McCaskill and MacShane's actions in breaking down Plaintiff's door and immediately attacking an unarmed middle-aged woman, breaking her elbow, and dragging her outside of her apartment while allowing the two men in the apartment to exit calmly and without injury, even though one of those men was standing right next to Plaintiff Toman and both he and Plaintiff Toman were standing peacefully nearby each other at the time of entry, were not justified by legitimate concerns of threat to officer safety.  McCaskill and MacShane's actions were taken as retaliation for Plaintiff Lourdes Toman's earlier exercise of her Fourth Amendment right to refuse consent to a search of her home by police without a warrant or warrant exception, which annoyed and frustrated the Fullerton Defendants.

33

FIRST AMENDED COMPLAINT

111.   The above-described actions of McCaskill and MacShane deprived Plaintiff Toman of her rights under the Fourth Amendment of the United States Constitution by targeting and punishing her specifically because she had exercised those rights.

112.   All actions herein complained of by McCaskill and MacShane were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Fullerton, and at all times, McCaskill and MacShane were acting under color of law.

113.   Pursuant to 42 U.S.C. 1983, Plaintiff is entitled to claim for damages for the deprivation of her rights under the Fourth Amendment to the United States Constitution. McCaskill and MacShane's conduct caused Plaintiff Toman damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of Defendants' actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since McCaskill and MacShane's actions were malicious, willful, committed with the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

### SIXTH CLAIM FOR RELIEF

**UNREASONABLE SEARCH IN VIOLATION OF CAL. CONST. ART. I § 13 AND CAL. CIV. CODE § 52.1**

**(All Plaintiffs Against Defendant Glomboske and Fullerton Defendants)**

114.   Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 83.

115.   On April 2, 2019, Fullerton Defendants Crabtree, Herrera, McCaskill, MacShane, Perez, and Salazar unreasonably searched Plaintiffs' homes without consent, without a warrant, and without a warrant exception, which violated their

FIRST AMENDED COMPLAINT

rights under the California Constitution, Article I Section 13. These Defendants had no warrant and no applicable exception to the requirement for a warrant; they knew or should have known they needed a warrant but nevertheless forcibly entered Plaintiffs' home, causing damage to the front door and emotional distress and humiliation to Plaintiffs.

116.   Defendant Pedrosa and Defendant Glomboske both failed to communicate and document their interactions at Plaintiffs' home, which foreseeably resulted in additional police visits and the constitutional violations described by the remaining Fullerton Defendants herein.

117.   The above-described actions of Defendant Glomboske and the Fullerton Defendants deprived all Plaintiffs of their rights under Article I Section 13 of the California Constitution to be free from unreasonable seizures. These acts constitute threats, intimidation, or coercion of Plaintiffs, interfering with or attempting to interfere with their exercise or enjoyment of the above-enumerated rights.

118.   All actions herein complained of by Glomboske and the Fullerton Defendants were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Brea or the City of Fullerton, and at all times, Glomboske and the Fullerton Defendants were acting under color of law.

119.   Pursuant to California Civil Code section 52.1, Plaintiffs are entitled to claim for damages for the deprivation of their rights under the California Constitution. Defendant Glomboske and Fullerton Defendants' conduct caused Plaintiffs damages in an amount to be proven at trial. Plaintiffs experienced significant emotional distress as a result of Defendants' actions. Plaintiffs are entitled to compensation for the emotional distress they experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Defendants' actions were

FIRST AMENDED COMPLAINT

malicious, willful, committed with the specific intent to deprive Plaintiffs of their rights, and/or in conscious disregard for Plaintiffs' rights.

## SEVENTH CLAIM FOR RELIEF

### EXCESSIVE FORCE/UNREASONABLE SEARCH IN VIOLATION OF CAL. CONST. ART. I § 13 AND CAL. CIV. CODE § 52.1
### (Plaintiff Toman Against MacShane and McCaskill)

120.   Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 83.

121.   On April 2, 2019, McCaskill and MacShane attacked Plaintiff Lourdes Toman while she was unarmed and standing peacefully inside her own home, when they had no warrant, no consent, and no applicable exception to a warrant to justify warrantless entry.  McCaskill and MacShane forcefully grabbed Plaintiff and dragged her out of her own home, breaking her elbow and her right fifth toe, and injuring her lower back, chest and ribs in the process, and causing other soft tissue damage.

122.   McCaskill and MacShane had no right to use any force on Plaintiff Lourdes Toman, nor to enter her home, thus, any force at all would have been excessive.  However, even if McCaskill and MacShane had the right to enter the home by force, Plaintiff was not a threat and was not behaving in a manner that justified grabbing her with enough force to break her elbow.  Even if McCaskill and MacShane had been justified in breaking down the door and entering forcibly (which they were not) they then should have assessed the situation for potential threats.  Upon seeing that the occupants were standing calmly without weapons, McCaskill and MacShane should then have secured the scene by handcuffing all occupants – without taking actions likely to injure the occupants.  The force actually used was excessive even without considering that McCaskill and MacShane had no underlying right to enter the home.

36

123.   The above-described actions of McCaskill and MacShane deprived Plaintiff of her right under Article I, section 13 of the California Constitution to be free from unreasonable seizures.  These acts constitute threats, intimidation, or coercion of Plaintiff, interfering with or attempting to interfere with her exercise or enjoyment of the above-enumerated rights.

124.   All actions herein complained of by McCaskill and MacShane were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Fullerton, and at all times, McCaskill and MacShane were acting under color of law.

125.   Pursuant to California Civil Code section 52.1, Plaintiff Toman is entitled to claim for damages for the deprivation of her rights under the California Constitution.  McCaskill and MacShane's conduct caused Plaintiff Toman damages in an amount to be proven at trial.  Plaintiff Toman experienced significant emotional distress as a result of McCaskill and MacShane's actions. Plaintiff Toman is entitled to compensation for the emotional distress she experienced as a result of their conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since McCaskill and MacShane's actions were malicious, willful, committed with the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

## EIGHTH CLAIM FOR RELIEF

## FALSE ARREST/UNREASONABLE SEIZURE IN VIOLATION OF CAL. CONST. ART. I § 13 AND CAL. CIV. CODE § 52.1

### (All Plaintiffs Against Fullerton Defendants)

126.   Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 83.

37

127.    Fullerton Defendants Crabtree, Herrera, McCaskill, MacShane, Perez, and Salazar further unreasonably seized and unlawfully arrested all three Plaintiffs by handcuffing them, removing them from their home, and taking them to the police station and detaining them there for a lengthy period of time, believed to be at least one hour, before releasing them without charges.

128.    None of the Plaintiffs appeared to be a threat to any Fullerton Defendant, nor offered any resistance at all to any Fullerton Defendant.  Although Plaintiff Lourdes Toman responded verbally to the break-in and was emotionally upset by the whole situation, she did not physically resist or threaten officers in any way to justify any arrest or detention for a criminal charge.  Alan Castro and Antonio Paredes were calm and cooperative and did not argue, yet they were arrested and detained anyway.

129.    Fullerton Defendants did not simply handcuff and remove Plaintiffs to secure the scene so that they could safely conduct the welfare check.  They handcuffed them, left them outside while they completed their investigation, and then transported them to the police station.  Even once at the police station, no Fullerton Police officer or supervisor intervened to insist that Plaintiffs be released immediately, despite Michael Fell having arrived on-site and explained the whole situation to McCaskill, who could have taken steps to contact Pedrosa and/or Glomboske before deciding to transport and arrest Plaintiffs.  Plaintiffs were detained for over an hour at the station until finally released – but offered them no transport to get home.

130.    The above-described actions of the Fullerton Defendants deprived all Plaintiffs of their rights under Article I, Section 13 of the California Constitution to be free from unreasonable seizures.

131.    All actions herein complained of by Fullerton Defendants were undertaken in the course and scope of their duties as duly sworn police officers

FIRST AMENDED COMPLAINT

employed by the City of Fullerton, and at all times, Fullerton Defendants were acting under color of law.

132.   Pursuant to California Civil Code section 52.1, Plaintiffs are entitled to claim for damages for the deprivation of their rights under the California Constitution.  Fullerton Defendants' conduct caused them damages in an amount to be proven at trial.  Plaintiffs experienced significant emotional distress as a result of Defendants' actions.  Plaintiffs are entitled to compensation for the emotional distress they experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Fullerton Defendants' actions were malicious, willful, committed with the specific intent to deprive Plaintiffs of their rights, and/or in conscious disregard for Plaintiffs' rights.

## NINTH CLAIM FOR RELIEF

### DEPRIVATION OF RIGHTS IN VIOLATION OF CAL. CIV. CODE § 52.1

**(Plaintiff Toman Against Glomboske, McCaskill and MacShane)**

133.   Plaintiff Toman realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 83.

134.   Glomboske's actions in threatening Plaintiff's husband's two realtors and directing them to take listed properties off the market at a time when almost no investigation had been conducted into whether Plaintiff was in fact legally married to James Toman, whether James Toman had been of sound mind at the time he retained the realtors, whether James Toman still wanted to sell the properties, or whether Plaintiff was abusing her husband, deprived Plaintiff of her rights as James Toman's wife and holder of his power of attorney and her rights to manage her husband's affairs with his consent, as well as her right to purchase property of her own along with her husband, as she was then in escrow to purchase a home contingent on the sale of James' other property/properties.

FIRST AMENDED COMPLAINT

135.   Glomboske successfully coerced both real estate agents to remove both properties from the market, and they were not sold; Plaintiff Toman was unable to purchase the real property that she had entered a contingent contract to buy.

136.   Glomboske's extreme actions in ordering third parties to halt major events in Plaintiff Toman's life – the purchase of a home and the sales of her husband's properties – were taken without any form of oversight, supervision, approval, or second opinion; without probable cause to believe she was committing any crime; and without a warrant.  On information and belief, it is not a standard practice of law enforcement to take extreme steps such as preventing the sale of the property of an elder or dependent adult without (1) probable cause to believe that financial abuse is actually being committed and (2) review of the proposed action exceeding the decision of a single, civilian, part-time investigator.

137.   Glomboske violated numerous of Plaintiff's rights guaranteed to her under common law, statutes, the California constitution, and the United States Constitution by coercing, intimidating and threatening real estate agents or brokers into taking Plaintiff's husband's properties off the market at a time when they already had accepted offers and made another offer contingent on the successful close of escrow of the two sales.

138.   McCaskill and MacShane's actions in breaking down Plaintiff's door and immediately attacking an unarmed middle-aged woman, breaking her arm, and dragging her outside of her apartment while allowing the two men in the apartment to exit calmly and without injury, even though one of those men was standing right next to Plaintiff Toman and both he and Plaintiff Toman were standing peacefully nearby each other at the time of entry, were not justified by legitimate concerns of threat to officer safety.  McCaskill and MacShane's actions were taken in order to intimidate and punish Plaintiff Lourdes Toman for her earlier exercise of her constitutional (both California and United States) right to refuse consent to a

FIRST AMENDED COMPLAINT

search of her home by police without a warrant or warrant exception, which annoyed and frustrated the Fullerton Defendants.

139.   The above-described actions of McCaskill and MacShane deprived Plaintiff Toman of her rights under the Fourth Amendment of the United States Constitution and Article I, Section 13 of the California Constitution by targeting and punishing her specifically because she had exercised those rights.

140.   McCaskill and MacShane's use of violence and property damage to punish and intimidate Plaintiff Toman constitute threats, intimidation, or coercion in violation of California Civil Code section 52.1.

141.   All actions herein complained of by McCaskill and MacShane were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Fullerton, and at all times, McCaskill and MacShane were acting under color of law.

142.   Pursuant to California Civil Code section 52.1, Plaintiff Toman is entitled to claim for damages for the deprivation of her rights under the United States and California Constitutions by means of threats, intimidation, or coercion. McCaskill and MacShane's conduct caused Plaintiff Toman damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of McCaskill and MacShane's actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since McCaskill and MacShane's actions were malicious, willful, committed with the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

### TENTH CLAIM FOR RELIEF
**ASSAULT AND BATTERY**
**(Plaintiff Toman Against McCaskill and MacShane)**

41

FIRST AMENDED COMPLAINT

143.   Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 83.

144.   On April 2, 2019, McCaskill and MacShane attacked Plaintiff Lourdes Toman while she was unarmed and standing peacefully inside her own home, when they had no right to enter.  McCaskill and MacShane forcefully grabbed Plaintiff and dragged her out of her own home, breaking her elbow and right fifth toe, and injuring her lower back, chest and ribs in the process, and causing other soft tissue damage.

145.   Plaintiff did not consent to be touched by McCaskill and MacShane at all, and Doe Defendants had no legal right to do so.

146.   Plaintiff was harmed and offended by McCaskill and MacShane's conduct.

147.   A reasonable person would have been harmed and offended by McCaskill and MacShane's conduct.

148.   McCaskill and MacShane's conduct deprived Plaintiff Toman of her rights, also causing her damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of McCaskill and MacShane's actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of McCaskill and MacShane's conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since McCaskill and MacShane's actions were malicious, willful, committed with the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

///

///

///

FIRST AMENDED COMPLAINT

## ELEVENTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH CONTRACT

#### (Plaintiff Toman Against Defendant Glomboske)

149.   Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 38.

150.   On or about January 22, 2019, Plaintiff Toman entered into a contract with Robert and Joyce Zurn to purchase the real estate located at 1473 Calle de Anza, Placentia CA 92870 along with her husband James.  That purchase was contingent on the sale of James' property at 3338 Greenleaf Drive, Brea California 92823, which was also under contract to be sold to a buyer, Ricky Martinez and Associates Investments, Inc.

151.   Defendant Glomboske knew of both of these contemplated real estate transactions.

152.   Defendant Glomboske's conduct in calling Lynne San Pedro to intimidate and threaten her that she would be in trouble if she assisted James in selling his home caused San Pedro to cancel escrow, and James was not thereafter able to sell the Greenleaf property.  Therefore, Plaintiff and James were not able to purchase the Placentia property, either.

153.   Defendant Glomboske intended to disrupt the sale and purchase of real property by calling Plaintiff and James' real estate agent, and knew that disruption was certain or substantially certain to occur.

154.   Plaintiff Toman was harmed by Defendant Glomboske's conduct; to this day, Plaintiff has not been able to purchase that property or any other property.

155.   Defendant Glomboske's conduct was a substantial factor in causing the harm to Plaintiff.

///

///

///

43

## TWELFTH CLAIM FOR RELIEF

## VIOLATION OF FOURTEENTH AMENDMENT

### (Plaintiff Toman Against Defendant Glomboske)

156.   Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 38.

157.   In December 2018 and January 2019, James Toman retained two real estate agents, Lynne San Pedro in California and Stephanie Yeaton in Maine, to sell his two homes so that he could distribute part of the proceeds to his children in accordance with his trust, and use the remainder of the proceeds to purchase a home with his wife, Plaintiff Lourdes Toman.  James was fully competent to make his own financial decisions when he decided to retain these two real estate agents.

158.   On or about January 22, 2019, Plaintiff Toman entered into a contract with Robert and Joyce Zurn to purchase the real estate located at 1473 Calle de Anza, Placentia CA 92870 along with her husband James.  That purchase was contingent on the sale of James' property at 3338 Greenleaf Drive, Brea California 92823, which was also under contract to be sold to a buyer, Ricky Martinez and Associates Investments, Inc.

159.   Defendant Glomboske knew of both of these contemplated real estate transactions, or else assumed their existence when he called both real estate agents to direct them not to assist Lourdes or James in selling any real estate.

160.   Glomboske's actions caused Yeaton to withdraw from the representation and caused San Pedro to cancel escrow; James was not thereafter able to sell the Greenleaf property.  Therefore, Plaintiff and James were not able to purchase the Placentia property, either.

161.   Defendant Glomboske intended to deprive Plaintiff of the ability to purchase real property using marital assets she and James were entitled to use, by calling Plaintiff and James' real estate agents, and knew that deprivation was certain or substantially certain to occur.

162.   Plaintiff Toman in fact experienced a deprivation because of Defendant Glomboske's conduct; to this day, Plaintiff has not been able to purchase that property or any other property.

163.   Defendant Glomboske's conduct was a substantial factor in causing the harm to Plaintiff.

164.   Glomboske's conduct deprived Lourdes of her right to purchase and sell property, and to act as her husband's power of attorney, without due process of law, and as such, violated her Fourteenth Amendment right to due process.

165.   All actions herein complained of by Glomboske were undertaken in the course and scope of his duties as a civilian investigator employed by the City of Brea, and at all times, Glomboske was acting under color of law.

166.   Pursuant to 42 U.S.C. 1983, Plaintiff is entitled to claim for damages for the deprivation of her rights under the Fourth Amendment to the United States Constitution. Glomboske's conduct caused Plaintiff Toman damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of Defendant's actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendant's conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since Glomboske's actions were malicious, willful, committed with the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in favor of Plaintiff and against each Defendant on all counts, and for actual damages and all other damages that may be allowed under state and federal law to Plaintiff; for punitive damages in the amount of $100,000 against each Defendant; for additional punitive damages in the amount of $250,000 against McCaskill and MacShane; for

FIRST AMENDED COMPLAINT

costs and reasonable attorneys' fees; for pre- and post-judgment interest as permitted by law; injunctive relief; and such other and further relief as the Court may deem just and appropriate.

**DATED:** June 30, 2020                **By:**      **RICKETTS LAW**

*Morgan Ricketts*

Morgan Ricketts
Attorney for Plaintiffs

FIRST AMENDED COMPLAINT

1

## VII. DEMAND FOR JURY TRIAL

2      Plaintiffs demand a trial by jury.

3

4

**DATED:** June 30, 2020                    **By:**   **RICKETTS LAW**
5

6                                                *Morgan Ricketts*

7                                          Morgan Ricketts
                                           Attorney for Plaintiffs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEMAND FOR JURY TRIAL