1                                                                            **O**

2

3

4

5

6

7

8                  **UNITED STATES DISTRICT COURT**

9           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11   LOURDES TOMAN;                          Case No. 8:20-cv-00046-JWH-KESx
     ANTONIO PAREDES; and
12   ALAN CASTRO,
                                             **MEMORANDUM OPINION AND**
13              Plaintiffs,                   **ORDER REGARDING CROSS**
                                             **MOTIONS FOR PARTIAL**
14        v.                                 **SUMMARY JUDGMENT [ECF**
                                             **Nos. 79 & 83]**
15   FULLERTON POLICE
        DEPARTMENT;
16   FULLERTON POLICE OFFICERS
        DAVIS CRABTREE (#1467),
17      RICHARD HERRERA (#1260),
        MICHAEL MCCASKILL (#1449),
18      DAVID MACSHANE (#1274),
        KEVIN PEDROSA, and DANIEL
19      PEREZ (#1547), all sued in their
        individual capacities; and
20   DOES 1-10, inclusive,

21              Defendants.

22

23

24

25

26

27

28

# I.  INTRODUCTION

Before the Court are two motions:

- the motion of Defendants City of Fullerton (the "City"), Davis Crabtree, Richard Herrera, Michael McCaskill, David Macshane, Kevin Pedrosa, and Daniel Perez (collectively, the "FPD Officers"; together with the City, the "City Defendants") for partial summary judgment;[1] and

- the motion of Plaintiffs Lourdes Toman, Antonio Paredes, and Alan Castro for partial summary judgment.[2]

After considering the papers filed in support and in opposition to both Motions, as well as the argument of counsel at the hearing on this matter, Defendants' Motion is **GRANTED in part** and **DENIED in part**, and Plaintiffs' Motion is **GRANTED in part** and **DENIED in part**, for the reasons set forth below.

---

[1]    Defs.' Mot. for Partial Summ. J. ("Defendants' Motion") [ECF No. 79]. The Court considered the following documents in connection with Defendants' Motion:  (1) Defendants' Motion (including its attachments); (2) Defs.' Req. for Judicial Notice in Supp. of Defendants' Motion [ECF No. 93]; (3) Pls.' Opp'n to Defendants' Motion (including its attachments) ("Pls.' Opposition") [ECF No. 95]; (4) Pls.' Resp. to Defs.' Statement of Facts ("Pls.' SDMF") [ECF No. 95-1]; (5) Pls.' Evid. Objs. in Supp. of Pls.' Opposition ("Pls.' Objections") [ECF No. 96]; (6) Decls. in Supp. of Pls.' Opposition [ECF Nos. 97 & 98]; (7) Defs.' Reply in Supp. of Defendants' Motion ("Defs.' Reply") [ECF No. 100]; (8) Defs.' Resp. to Pls.' SDMF [ECF No. 101]; and (9) Defs' Evid. Objs. in Supp. of Defs.' Reply ("Defs.' Reply Objections") [ECF No. 102].

[2]    Pls.' Mot. for Partial Summ. J. ("Plaintiffs' Motion") [ECF No. 83].  The Court considered the following documents in connection with Plaintiffs' Motion:  (1) Plaintiffs' Motion (including its attachments); (2) Decls. in Supp. of Plaintiffs' Motion [ECF Nos. 84–86]; (3) Pls.' Amend. Mot. for Partial Summ. J. (including its attachments) [ECF No. 88]; (4) Defs.' Opp'n to Plaintiffs' Motion ("Defs.' Opposition") [ECF No. 89]; (5) Defs.' Resp. to Pls.' Statement of Facts ("Defs.' SDMF") [ECF No. 90]; (6) Defs' Evid. Objs. in Supp. of Defs.' Opposition ("Defs.' Objections") [ECF No. 91]; and (7) Pls.' Reply in Supp. of the Plaintiffs' Motion [ECF No. 106].

## II.  PROCEDURAL BACKGROUND[3]

Plaintiffs filed their Complaint commencing this action in January 2020.[4] Plaintiffs filed the operative First Amended Complaint six months later.[5]  In that pleading, Plaintiffs assert the following 12 claims for relief:  (1) *Monell* Violation; (2) Unreasonable Search in Violation of the Fourth Amendment, 42 U.S.C. § 1983; (3) Excessive Force/Unreasonable Seizure in Violation of the Fourth Amendment, 42 U.S.C. § 1983; (4) Unlawful Arrest/Unreasonable Seizure in Violation of the Fourth Amendment, 42 U.S.C. § 1983; (5) Retaliation in Violation of the Fourth Amendment, 42 U.S.C. § 1983; (6) Unreasonable Search in Violation of Cal. Const., Art. I § 13, Cal. Civ. Code § 52.1; (7) Unreasonable Seizure/Excessive Force in Violation of Cal. Const., Art. I § 13, Cal. Civ. Code § 52.1; (8) Unreasonable Seizure/False Arrest in Violation of Cal. Const., Art. I § 13, Cal. Civ. Code § 52.1; (9) Deprivation of Rights in Violation of Cal. Civ. Code § 52.1; (10) Assault and Battery; (11) Tortious Interference with Contract; and (12) Deprivation of Due Process in Violation of the Fourteenth Amendment, 42 U.S.C. § 1983.

The City Defendants move for partial summary judgment with respect to Plaintiffs' First, Third, Fourth, Seventh, Eighth, and Tenth Claims for Relief. Plaintiffs move for summary judgment with respect to their First through Fourth Claims for Relief, on only the issue of liability.

---

[3]      The City Defendants object to Plaintiffs' Supplemental Brief in Support of Plaintiffs' Motion [ECF No. 116].  *See* Defs.' Obj. to Supp. Br. [ECF No. 117].  Specifically, the City Defendants complain about Plaintiffs' tardy filing of their supplemental brief, in violation of the Court's Minute Order of July 9, 2021.  *Id.* at 2:8-11.  The City Defendants rightly argue that Plaintiffs' late submission is part of a pattern of late submissions in violation of court orders. *Id.* at 2:12-22.  Accordingly, the Court **SUSTAINS** the City Defendants' objection and **STRIKES** Plaintiffs' supplemental brief.

[4]      Pls.' Compl. [ECF No. 1].

[5]      Pls.' First Am. Compl. [ECF No. 34].

### III.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party.  *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  The substantive law determines the facts that are material.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  Factual disputes that are "irrelevant or unnecessary" are not counted.  *Id.*  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Under that standard, the moving party bears the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  *Id.* at 325.  Instead, the moving party need only prove the absence of evidence to support the nonmoving party's case. *See id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson*, 477 U.S. at 250.

If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Celotex*, 477 U.S. at 324. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252). The non-moving party must make this showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252.

## IV. FACTS

Unless specifically noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted:[6]

On April 2, 2019,[7] non-party Kevin Toman called the business line of the City of Fullerton Police Department (the "FPD") to request a welfare check on his 92-year-old-father, non-party James Toman ("Mr. Toman").[8] Kevin[9] had

---

[6]    **Request for Judicial Notice:** The City Defendants' Req. for Judicial Notice in Supp. of Defendants' Motion [ECF No. 93] is **GRANTED**.

   **Evidentiary Objections:** The City Defendants filed numerous objections to the evidence that Plaintiffs submitted in support of Plaintiffs' Motion and in support of Plaintiffs' Opposition. *See* Defs.' Objections; Defs.' Reply Objections. Likewise, Plaintiffs filed objections to the evidence that the City Defendants submitted in support of Defendants' Motion. *See* Pls.' Objections. The Court does not rely on most of the evidence to which the parties object, and, thus, many of the remaining objections are moot. *See, e.g.*, *Smith v. Cnty. of Humbolt*, 240 F. Supp. 2d 1109, 1115–16 (N.D. Cal. 2003). To the extent that the Court relies on any other evidence in this order without discussion of the objection, the relevant objections are **OVERRULED**. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1118, 1122 (E.D. Cal. 2006) (concluding that "the court will [only] proceed with any necessary rulings on defendants' evidentiary objections").

[7]    Unless otherwise indicated, all dates are in 2019.

[8]    Defs.' SDMF ¶ 127.

[9]    The Court intends no disrespect in referring to Mr. Toman's son, Kevin Toman, by his first name.

1    not heard from Mr. Toman in a week.  He reported to the FPD that his father

2    was bedridden and that he suffered from kidney issues and blood clots.[10]  When

3    the FPD operator asked if Mr. Toman had anyone to assist him, Kevin

4    responded that Mr. Toman had an intermittent caregiver and provided the FPD

5    with the caregiver's phone number.[11]

6         Around 3:27 p.m. that day, Defendants David Macshane and Davis

7    Crabtree—both Corporals in the FPD—arrived at the front door of

8    Mr. Toman's apartment.[12]  Macshane rang the Ring video security system

9    doorbell and knocked on the front door.[13]  Mr. Toman's spouse, Plaintiff

10    Lourdes Toman ("Mrs. Toman"), responded through the Ring video security

11    system and asked Macshane to identify himself.[14]  Macshane identified himself

12    as a police officer and stated that he was there to conduct a welfare check on

13    Mr. Toman.[15]  There was a pause in communication for a few minutes during

14    which Macshane could hear movement inside the apartment.[16]  While Macshane

15    remained at the front door, Crabtree walked around the outside of the building

16    to the apartment's fenced back patio where Plaintiff Antonio Paredes was

17    standing.[17]  In response to questions from Macshane, Paredes identified himself

18    and stated that he lived in the apartment.  Paredes then walked inside the

19    apartment and closed the patio door.[18]  Crabtree, at that point, observed a

20    wheelchair on the patio and another man standing near the doorway of the patio

21

22    —————————————
[10]    Defs.' SDMF ¶ 128.

23    [11]    *Id.* at ¶¶ 129 & 130.

    [12]    *Id.* at ¶ 131; Pls.' SDMF ¶ 2.

24    [13]    *Id.*

25    [14]    *Id.* at ¶ 3.

    [15]    *Id.* at ¶ 7.

26    [16]    *Id.* at ¶ 4.

27    [17]    Defs.' SDMF ¶ 133.

28    [18]    *Id.* at ¶ 134.

door.[19]  Around 3:30 p.m., Crabtree returned to the front door of the apartment to report his observations to Macshane.[20]

At that time, Macshane was speaking to an occupant of the apartment through the front door (or the Ring security system) and was explaining that a family member had requested a welfare check on Mr. Toman.[21]  Mrs. Toman then called out from inside the apartment asking for Macshane's badge number.[22]  She also confirmed that Mr. Toman lived at the apartment.[23] Eventually, Mrs. Toman asked Macshane to call her lawyer and began to recite her lawyer's phone number, to which Macshane responded, "No, I'm not writing your lawyer's number down."[24]  Crabtree then told Mrs. Toman, "Ma'am, you either open the door or we're going to break this door in."[25] Mrs. Toman continued to recite her lawyer's phone number, but Crabtree responded, "We're not calling your lawyer."[26]  Around 3:34 p.m., Macshane told Mrs. Toman, "I'll talk to your lawyer on the phone if you want to answer the door."[27]  Mrs. Toman responded that her lawyer was on his way.  Macshane replied by asking, "Where is James?"[28]  The occupants then ceased communicating with Macshane and Crabtree.[29]

---

[19]    *Id.* at ¶¶ 135 & 136.

[20]    *Id.*; *see also* Pls.' SDMF ¶ 6.

[21]    *See* Pls.' SDMF ¶ 7; Defs.' SDMF ¶¶ 139–143.

[22]    Pls.' SDMF ¶ 7.

[23]    *See* Defs.' SDMF ¶ 142.

[24]    *Id.* at ¶ 144.

[25]    *Id.*

[26]    *Id.*

[27]    *Id.* at 147; *see also* Pls.' SDMF ¶ 8.

[28]    Defs.' SDMF ¶ 147.

[29]    Pls.' SDMF ¶ 8.

1    Macshane directed Crabtree to call for a supervisor and commented,

2    "Something's odd . . . . I want to confirm who's here before we force entry."[30]

3    Crabtree reported the situation to dispatch and requested two additional units.[31]

4    Crabtree subsequently received a call on his cell phone and explained the

5    situation to the caller.[32]  Crabtree explained what he and Macshane had observed

6    and told the caller that a female was inside the apartment and was refusing to

7    open the door.[33]  Then Crabtree said, "So we don't know if like the family's

8    squatting there, like maybe the caretaker has family there.  But they're not, she's

9    just refusing to open the door and do that welfare check . . . ."[34]

10    While Macshane and Crabtree awaited the arrival of additional officers,

11    Macshane attempted to communicate with Mrs. Toman, and Crabtree

12    interviewed staff members at the apartment complex.  Those staff members told

13    Crabtree that "Lourdes" and some of her family members were on the

14    apartment lease, but James Toman was not.[35]  Crabtree also learned that

15    Mr. Toman was receiving hospice care "a couple of times per week"; that

16    Mr. Toman's medication was delivered to the apartment; and that Mrs. Toman

17    was under investigation for financial elder abuse of Mr. Toman.[36]  Crabtree

18    returned and reported that information to Macshane.[37]  Macshane, in turn,

19    reported that he had discovered a plastic grocery bag containing soiled "hospital

20

21

---

22   [30]    Defs.' SDMF ¶ 148.  The Officers called for a supervisor because the FPD wanted officers to have a supervisor present when forcing entry.  *Id.* at ¶ 149.

23   [31]    *See id.* at ¶¶ 150–152.

24   [32]    *See id.* at ¶ 156.

25   [33]    *Id.*

26   [34]    *Id.*

27   [35]    *Id.* at ¶ 157.

    [36]    *Id.* at ¶ 158; Pls.' SDMF ¶ 9.

28   [37]    *Id.* at ¶ 159.

bedding and medical type like, gauze or bandages" outside the front door of the apartment.[38]

Crabtree then interviewed the apartment manager, who confirmed that three people were on the lease, including Mrs. Toman.[39]  The manager also commented that, during the prior week, she had seen multiple caregivers and, on one occasion a priest, going in and out of the apartment.[40]  Crabtree told the manager that he and Macshane were "kind of puzzled" and that they did not "know what's going on" (*i.e.*, why they were not being allowed into the apartment).[41]  Meanwhile, Macshane spoke to the two apartment employees whom Crabtree had interviewed and confirmed the information that they had provided to Crabtree.[42]  Crabtree eventually returned and reported to Macshane the information from his conversation with the apartment manager.[43]  Crabtree remarked, "Strange.  Elder—financial stuff, you think?"[44]

After 20 minutes of investigation, Macshane suggested that Crabtree call Kevin, which Crabtree did.[45]  During that phone call, Crabtree asked Kevin who Mr. Toman's current caregiver was; when Kevin last spoke to Mrs. Toman; if Kevin's visit the prior Sunday was at the apartment; if Mr. Toman was supposed to be living with Mrs. Toman; if Kevin knew any reason why Mrs. Toman would not allow police into the apartment; and how the Brea Police Department was involved.[46]

---

[38]     *See id.* at ¶¶ 160 & 171.
[39]     *Id.* at ¶ 161.
[40]     *Id.* at ¶¶ 162 & 163.
[41]     *Id.* at ¶ 166.
[42]     *Id.* at ¶ 167.
[43]     *Id.* at ¶ 172.
[44]     *Id.* at ¶ 168.
[45]     *Id.* at ¶¶ 175 & 176.
[46]     *See id.* at ¶¶ 181 & 182.

Some background information is necessary to understand the relevance of Crabtree's questions about Kevin's prior visit and the Brea Police Department's involvement, although the Court notes that, at the scene of the incident, FPD Officers were aware of only some of these details:  On March 20, Brea Police Investigator Jerry Glomboske interviewed Mr. Toman alone at the apartment for 30 minutes with Mrs. Toman's consent.[47]  On March 23, Kevin arrived unannounced at the apartment asking to see Mr. Toman.[48]  Eventually Mr. and Mrs. Toman agreed to meet Kevin at a neutral location the following day.[49] That meeting ended with Kevin calling the paramedics, who performed a medical evaluation of Mr. Toman and concluded that Mr. Toman's vital signs were normal and that he was alert and oriented.[50]  The next day, Mrs. Toman retained attorney Michael Fell to represent her in connection with the issues with Mr. Toman's family.[51]  Between March 26 and 28, Fell and Glomboske exchanged emails regarding Mr. Toman's estate and his marriage to Mrs. Toman.[52]  On March 29, Defendant Kevin Pedrosa—an FPD Detective— accompanied by another police officer and a social worker, arrived at Mr. Toman's apartment and stated that Glomboske had sent them to conduct a welfare check on Mr. Toman.[53]  Fell advised Mrs. Toman not to allow anyone to enter the apartment without a warrant.[54]  Eventually, after speaking to Fell, Pedrosa agreed to return with a warrant, although it appears that he never did.[55]

---

[47]    *See id.* at ¶¶ 90 & 91.
[48]    *Id.* at ¶ 95.
[49]    *Id.* at ¶ 100.
[50]    *Id.* at ¶ 103.
[51]    *Id.* at ¶ 108.
[52]    *See id.* at ¶¶ 109–111.
[53]    *Id.* at ¶ 113.
[54]    *Id.* at ¶¶ 115 & 116.
[55]    *See id.* at ¶¶ 118–124.

Returning to Crabtree's questions to Kevin on April 2—the date of the incident—Kevin identified Glomboske as an investigator with the Brea Police Department who was investigating Mrs. Toman for possible financial elder abuse.  Kevin provided Crabtree with the Brea Police Department's phone number.[56]

While Crabtree was speaking with Kevin, Defendant Michael McCaskill—an FPD Sergeant—and Defendants Daniel Perez and Richard Herrera arrived on-scene.[57]  Macshane explained to McCaskill that Kevin requested a welfare check; the occupants of the apartment confirmed that Mr. Toman was inside but refused to open the door; and the female occupant was on the phone with her lawyer.[58]  Fresh off his phone call with Kevin, Crabtree briefed McCaskill and Macshane on what he had learned:

> It sounds like there's an ongoing . . . elder financial abuse between this Lourdes chick . . . .  Son just saw Dad last Sunday here . . . . Lourdes is living here and I guess they had some kind of consensual relationship in years past . . . .  And somehow Brea is involved with an open case with adult protective services.  He came last week, and I guess she put up like, a fight, obviously, when she found out the police were coming.  She finally let the son in and he saw dad.  So it sounds like it's an ongoing adult protective abuse financial stuff with this Lourdes lady.  That's what—that's all I have.[59]

McCaskill responded:

> So, what I got, from what you're both saying is, [Mr. Toman] lives here. . . .  [Mr. Toman's] in his 90's.  And we need to check the

---

[56] *Id.* at ¶ 181.
[57] *Id.* at ¶ 177.
[58] *Id.* at ¶¶ 183 & 185.
[59] *Id.* at ¶ 186.

1   welfare. . . .   And we're not being allowed to check the welfare . . . .

2   And, we have a lawful reason to make entry and check the welfare.

3   And if we can warn them that they're going to get arrested if they

4   don't allow us in to check to make sure he's okay or they can have

5   him come out.   But either way, we need to check to make sure he's

6   okay.   And otherwise, they're in violation of 148 and they're gonna

7   go to jail.[60]

8   Herrera then told Macshane that he saw a female on the back patio who

9   told him that her lawyer was on his way.[61]   Crabtree, Herrera, Macshane, and

10   McCaskill returned to the front door of the apartment while Perez watched the

11   back patio.[62]   Crabtree knocked on the door and announced:  "This is the

12   Fullerton Police Department . . . you guys have to open the door.   If you refuse

13   to open the door, you will be arrested for resisting a peace officer."[63]   A male

14   occupant responded from inside the apartment, "Can you show us a warrant?"[64]

15   Crabtree responded, "There is no warrant.   We don't need the warrant.   If you

16   don't open the door, you will be arrested."[65]   The male occupant then stated

17   again that their lawyer was on his way, to which Crabtree responded:  "That's

18   fine, your lawyer can be on his way.   If you do not open the door, you will be

19   arrested.   All the occupants that choose not to open the door will be arrested.

20   This is your final warning."[66]   Mrs. Toman then asked again if the officers had a

21   warrant, to which Macshane responded "no" and warned that the Officers were

22

23

---

60   *Id.* at ¶ 190.

24   61   *Id.* at ¶ 192.

25   62   *See id.* at ¶¶ 191 & 193.

26   63   *Id.* at ¶ 193.

     64   *Id.* at ¶ 195.

27   65   *Id.* at ¶ 196.

28   66   *Id.* at ¶ 198.

1  going to break down the door.[67]  McCaskill added, "We're doing a

2  community—we're doing a welfare check."[68]

3        Immediately thereafter, Macshane forced entry into the apartment by

4  kicking the door four times.[69]  Approximately 31 minutes elapsed between

5  Macshane's first knock on the front door and his first kick on the door.[70]  Once

6  inside the apartment, Macshane forcefully detained Mrs. Toman with

7  McCaskill's assistance and removed Mrs. Toman to the exterior hallway.[71]

8  Mrs. Toman sustained injuries during her detention and arrest.[72]  Meanwhile,

9  Crabtree discovered Plaintiffs Castro and Paredes in another room, and FPD

10 Officers took them into custody without incident.[73]  In the exterior hallway,

11 McCaskill told Mrs. Toman, "We don't need a warrant to come inside your

12 house and check the welfare of somebody."[74]  Ultimately, over the protestations

13 of Plaintiffs' counsel, who arrived at the apartment within five minutes of the

14 forced entry,[75] Plaintiffs were arrested for resisting, delaying, or obstructing a

15 peace officer who was engaged in the performance of his duties in violation of

16 California Penal Code § 148(a)(1).[76]

---

[67]    *See id.* at ¶¶ 202 & 203.

[68]    *Id.* at ¶ 204.

[69]    *Id.* at ¶ 208.

[70]    *Id.* at ¶ 206.

[71]    *Id.* at ¶¶ 210, 211, & 213; *see also* Pls.' SDMF ¶¶ 15 &16.

[72]    *See* Defs.' SDMF ¶ 214.

[73]    *See id.* at ¶ 225; Pls.' SDMF ¶ 17.

[74]    Defs.' SDMF ¶ 223.

[75]    *See id.* at ¶¶ 230–237, 239, 240, & 243–247.

[76]    *See id.* at ¶¶ 240–242 & 249.

# V.  DISCUSSION

## A.    First Claim for Relief—*Monell* Liability

Plaintiffs' First Claim for Relief is for *Monell* liability against the City. The City contends that Plaintiffs' *Monell* claim fails because there is no evidence showing the existence of a municipal policy or ratification of unconstitutional conduct by a final decisionmaker.  Plaintiffs conceded their *Monell* claim at the hearing.  Accordingly, with respect to Plaintiffs' First Claim for Relief, the Court **GRANTS** Defendants' Motion and **DENIES** Plaintiffs' Motion.

## B.    Second and Fourth Claims for Relief

In their Second Claim for Relief, Plaintiffs allege that the City Defendants violated the Fourth Amendment's prohibition against unreasonable searches. Relatedly, in their Fourth Claim for Relief, Plaintiffs allege that because the search was unlawful under the Fourth Amendment, the subsequent arrests were also unlawful.  Plaintiffs seek partial summary judgment with respect to both claims on the issue of liability;[77] the City Defendants seek summary judgment with respect to only Plaintiffs' Fourth Claim for Relief.[78]  The individual FPD Officers also contend that they are entitled to qualified immunity.

The Court first addresses whether a constitutional violation occurred with respect to each claim for relief, and then addresses whether the individual FPD Officers are entitled to qualified immunity.

### 1.    Unreasonable Search and Seizure

The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

---

[77]    *See* Plaintiffs' Motion 18:4–25:2.

[78]    *See* Def.'s Motion 18:24–20:28.

-14-

1    supported by Oath or affirmation, and particularly describing the

2    place to be searched, and the persons or things to be seized.

3    U.S. Const. amend. IV.  Warrantless entries into a home by police officers are

4    presumptively unreasonable and, therefore, are unconstitutional.  *See Groh v.*

5    *Ramirez*, 540 U.S. 551, 559 (2004) (it is a "basic principle of Fourth Amendment

6    law that searches and seizures inside a home without a warrant are

7    presumptively unreasonable" (internal quotation omitted)).  Absent exigent

8    circumstances, the warrant requirement applies to any governmental intrusion

9    into a home, including an investigatory welfare check.  *See Calabretta v. Floyd*,

10   189 F.3d 808, 813 (9th Cir. 1998).  Furthermore, the Fourth Amendment

11   "protects against warrantless arrest inside a person's home in the same fashion

12   that it protects against warrantless searches of the home, which is to say that

13   police officers may not execute a warrantless arrest in a home unless they have

14   both probable cause and exigent circumstances."  *Hopkins v. Bonvicino*, 573 F.3d

15   752, 773 (9th Cir. 2009).

16        Here, the determination of whether the search was unlawful and,

17   relatedly, whether there was probable cause to arrest Plaintiffs, turns upon

18   whether the FPD Officers were acting lawfully when they demanded to enter,

19   and then when they subsequently entered, Plaintiffs' apartment without a

20   warrant.  The City Defendants invoke the emergency exception to the Fourth

21   Amendment's warrant requirement as justification for the warrantless entry.

22        a.    **Emergency Exception under the Fourth Amendment**

23        The emergency exception to the warrant requirement is analyzed under

24   the reasonableness standard.  That is, "law enforcement must have an *objectively*

25   *reasonable basis* for concluding that there is an immediate need to protect others

26   or themselves from serious harm."  *Hopkins*, 573 F.3d at 763–64 (emphasis in

27   original) (quoting *United States v. Snipe*, 515 F.3d 947, 951–52 (9th Cir. 2008)).

28   "[I]f [police officers] otherwise lack reasonable grounds to believe there is an

-15-

1    emergency," they must "take additional steps to determine whether there [i]s

2    an emergency that justifie[s] entry in the first place." *Id.* at 765 (alterations in

3    original) (quoting *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006)).

4    Courts "judge whether or not the emergency exception applies in any given

5    situation based on the totality of the circumstances . . . ." *Id.* at 764 (quoting

6    *United States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir. 2005)).

7          Plaintiffs contend that the undisputed evidence shows that the FPD

8    Officers lacked reasonable grounds to believe that there was an emergency.  The

9    City responds that a warrantless entry is permitted when there is "an emergency

10   such as the 'community caretaking function.'"[79]  However, the "community

11   caretaking function" is not, in and of itself, an emergency that justifies a

12   warrantless entry.  *See Calabretta*, 189 F.3d at 813; *Hopkins*, 573 F.3d at 765–66.

13   Indeed, in *Calabretta*, the Ninth Circuit expressly rejected the argument that a

14   search warrant is not required for "home investigatory visits[.]"  *Calabretta*, 189

15   F.3d at 813.  And, more recently, in *Caniglia v. Strom*, 141 S. Ct. 1596 (2021), the

16   Supreme Court rejected the First Circuit's so-called "community caretaking"

17   exception to the Fourth Amendment and reaffirmed the well-established

18   principle that law enforcement officers may enter private property without a

19   warrant only when exigent circumstances exist, "including the need to 'render

20   emergency assistance to an injured occupant or to protect an occupant from

21   imminent injury.'"  *Id.* at 1599.  Thus, here, in the absence of objective indicia

22   showing an emergency, the officers were not acting lawfully when they

23   demanded—without a warrant—that Mrs. Toman admit them to the apartment

24   for the sole purpose of conducting a welfare check.  *See People v. Wetzel*, 11

25   Cal. 3d 104, 107–08 (1974); *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir.

26   2005).

27

28   [79]    Defendants' Motion 20:4–6.

-16-

1    The City contends that, putting aside the community caretaking

2    justification, the FPD Officers reasonably believed that there was an emergency

3    regarding the health and safety of Mr. Toman because: the officers did not know

4    who was in the apartment; Mr. Toman's caregiver did not appear to be at the

5    apartment; the officers observed two unknown male subjects in the apartment

6    without explanation; the occupants were able to conduct surveillance of what

7    was happening outside of the apartment; one male subject actively avoided

8    police contact; and there was an ongoing investigation into possible elder abuse

9    of Mr. Toman.[80]  Those observations, however, do not support an objectively

10   reasonable belief for "concluding that there is an immediate need to protect

11   others or themselves from serious harm." *Hopkins*, 573 F.3d at 763–64.

12   Other cases in this Circuit that have upheld a warrantless search of a

13   residence under the emergency exception involved significantly more evidence

14   of an emergency. *See id.* at 766 (analyzing cases).  For example, in *United States*

15   *v. Martinez*, 406 F.3d 1160 (9th Cir. 2005), officers responding to a report of

16   domestic violence found a woman crying on the lawn outside of the home and

17   heard a man shouting inside. *Id.* at 1165.  The Ninth Circuit upheld the

18   warrantless entry of the home, concluding that the officers reasonably believed

19   that there was an emergency at hand because of the unique context of a domestic

20   abuse call where "violence may be lurking and explode with little warning," *id.*

21   at 1164 (quoting *Fletcher v. Clinton*, 196 F.3d 41, 50 (1st Cir. 1999)), and because

22   the officers had a meaningful reason to believe that "the occupant may injure

23   himself or others," *id.* at 1165, or that one of the parties to the dispute was in

24   danger," *id.* (quoting *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998)).

25   In *White v. Pierce County*, 797 F.2d 812 (9th Cir.1986), officers responded

26   to a report that a seven-year-old boy had several welts on his back, suggestive of

27

28   [80]    *Id.* at 20:9–20.

-17-

child abuse. *Id.* at 813.  When officers arrived at the home, the boy and his father talked to the police officer at the door, and the boy tried to show the officer his back, but the father stopped him. *Id.* at 814.  Based upon the nature of the report and the father's violent and abusive response when questioned, the officers thought that if they delayed in order to obtain a warrant the father would injure the child before they could return. *See id.* at 815–16.  In view of those facts, the Ninth Circuit concluded that the officers "had probable cause to believe the child had been abused and that the child would be injured or could not be taken into custody if it were first necessary to obtain a court order." *Id.* at 815.

By contrast, there was no such objective indicia of an imminent emergency here.  Kevin's report did not describe any evidence of physical abuse, nor did the officers perceive any danger of injury or loss of evidence if they secured a warrant.  Indeed, the only identifiable reason why the FPD Officers did not seek a search warrant was their subjective opinions that they did not need one.  After Macshane and Crabtree briefed McCaskill on the situation, McCaskill reached the following conclusions:

> So, what I got, from what you're both saying is, [Mr. Toman] lives here. . . .  [Mr. Toman's] in his 90's.  And we need to check the welfare. . . .  And we're not being allowed to check the welfare . . . .  And, ***we have a lawful reason to make entry and check the welfare***.  And if we can warn them that they're going to get arrested if they don't allow us in to check to make sure he's okay or they can have him come out.  But either way, we need to check to make sure he's okay.  And otherwise, they're in violation of 148 and they're gonna go to jail.[81]

---

[81]     Defs.' SDMF ¶ 190 (emphasis added); *see also id.* at ¶¶ 186, 191–193, 195, 196, 198, 202, & 203.

When Crabtree subsequently warned Mrs. Toman that the officers were planning to make a forced entry, Mrs. Toman asked again whether the officers had a warrant.[82]  Crabtree responded:  "There is no warrant.  We don't need a warrant.  If you don't open the door, you will be arrested."[83]  McCaskill added:  "We're doing a community—we're doing a welfare check."[84]  Thus, the undisputed evidence shows that throughout the interaction, the FPD Officers believed that their purpose and desire to conduct a welfare check on Mr. Toman constituted an "emergency" that justified the warrantless entry.  However, it was well-established at that time, and the Supreme Court recently reaffirmed in *Caniglia*, that law enforcement's "community caretaking" function is not enough by itself to justify a warrantless entry; there must be objective indicia of an emergency requiring immediate attention.  *See Caniglia*, 141 S. Ct. at 1599; *Calabretta*, 189 F.3d at 813.  Although the FPD Officers may have had reasonable grounds to believe that Mr. Toman was in poor health, officers presented with the information gathered here could not reasonably conclude, on the basis of that information alone, that they had an "objectively reasonable basis" to suspect that a medical emergency was at hand.  *See Hopkins*, 573 F.3d at 765.

When "[police officers] otherwise lack reasonable grounds to believe there is an emergency," they must "take additional steps to determine whether there [i]s an emergency that justifie[s] entry in the first place."  *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006).  Here, to extent that the FPD Officers took additional investigative steps, that investigation was not sufficient and, to the extent that the FPD Officers learned additional information, that information did not indicate that an imminent emergency existed.  The FPD

---

[82]   *See id.* at ¶ 196.

[83]   *Id.*

[84]   *Id.* at ¶ 204.

1  Officers knew that the alleged elder abuse was financial—not physical.[85]  They

2  knew that Mr. Toman was receiving hospice care from caregivers who are

3  mandated reporters[86]—meaning that they are legally obligated to report

4  suspected elder abuse—yet the FPD Officers did not attempt to contact the

5  hospice company to ask about Mr. Toman's condition or to determine whether

6  there were any reports of physical elder abuse.[87]  Mrs. Toman asked the FPD

7  Officers multiple times to contact her lawyer, which the FPD Officers

8  repeatedly refused to do.[88]  Finally, the FPD Officers were aware that, a few

9  days earlier, officers from the Brea Police Department had attempted to conduct

10  a welfare check on Mr. Toman.[89]  Inexplicably, none of the FPD Officers

11  attempted to contact their colleagues in the Brea Police Department to gather

12  the details of that interaction in order to inform their assessment of the situation

13  that they faced.

14       For the foregoing reasons, the Court concludes that the warrantless entry

15  by FPD Officers was unlawful.

16            **b.      Probable Cause for Arrest**

17       To prevail on their Fourth Claim for Relief for unreasonable seizure/false

18  arrest, Plaintiffs must show that their arrests were without probable cause or

19  other justification.  *See Dubner v. City and Cnty. of San Francisco*, 266 F.3d 959,

20  964–65 (9th Cir. 2001).  "Under California law, an officer has probable cause for

21  a warrantless arrest 'if the facts known to him would lead a [person] of ordinary

22  care and prudence to believe and conscientiously entertain an honest and strong

23  suspicion that the person is guilty of a crime.'"  *Peng v. Mei Chin Penghu*, 335

24

25  [85]     *See id.* at ¶¶ 168 & 186.

26  [86]     *Id.* at ¶ 164.

27  [87]     *See id.* at ¶¶ 81–85 & 164.

    [88]     *See id.* at ¶ 173.

28  [89]     *See id.* at ¶¶ 112–126, 181, & 186.

1  F.3d 970, 976 (9th Cir. 2003) (quoting *People v. Adams*, 175 Cal. App. 3d 855

2  (1985)).

3        For the reasons stated in the preceding section, the Court concludes that

4  the warrantless arrest was not justified by an emergency.  The City concedes

5  that the only crime for which it claims that the FPD Officers had probable cause

6  to enter Plaintiffs' residence and subsequently to arrest Plaintiffs, was resisting,

7  delaying, or obstructing a peace officer who was engaged in the performance of

8  his duties, in violation of Cal. Penal Code § 148.  The Ninth Circuit has held,

9  however, that "the lawfulness of the officer's conduct is an essential element"

10  of the offense under Cal. Penal Code § 148 in the first instance.  *Smith*, 394 F.3d

11  at 695.  In this regard, the City Defendants contend that, "[i]n terms of whether

12  the Officers' investigation and orders were lawful here, a warrantless entry may

13  be made by officers when there is an emergency such as 'the community

14  caretaking function.'"[90]  For the reasons stated in the preceding sections, the

15  Court finds that the FPD Officers' orders and warrantless entry were unlawful.

16  Therefore, the Court further finds that FPD Officers lacked probable cause to

17  believe that Plaintiffs violated Cal. Penal Code § 148 by refusing to consent to a

18  warrantless search.  *See Wetzel*, 11 Cal. 3d at 107–08 (refusal to consent to a

19  search—a lawful warrantless search in *Wetzel*—"cannot constitute grounds for

20  a lawful arrest or subsequent search and seizure").

21        Accordingly, the Court finds that the FPD Officers unreasonably seized

22  Plaintiffs without probable cause or exigent circumstances, thus violating their

23  Fourth Amendment rights.

24      **2.**    **Qualified Immunity**

25        "Qualified immunity shields government officials from civil damages

26  liability unless the official violated a statutory or constitutional right that was

27

28    [90]    Defs.' Opposition 12:8–10.

clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).  Thus, a qualified-immunity analysis involves two separate steps:  the court first determines whether the facts show that the officer's conduct violated a constitutional right; if so, the court must then determine whether that constitutional right was clearly established at time of the alleged unlawful action.  *See id.*; *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Taylor*, 575 U.S. at 825 (brackets and internal quotation marks omitted).  The law does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Officers who violate a clearly established constitutional right are not entitled to qualified immunity.

Here, because the Court has determined that Plaintiffs' constitutional rights were violated, the Court must consider whether those rights were clearly established at the time of the violation.  The City Defendants contend that "[a] police officer's rights to investigate in a community caretaking function and arrest suspects for [a violation of Cal. Penal Code § 148] in circumstances similar to these is well-established . . . ."[91]  That argument is incorrect as a matter of law.  For the reasons stated in the preceding sections, it is well-established that ***in the absence of exigent circumstances or emergency***, there is no "community caretaking" exception to the Fourth Amendment's warrant requirement.  Indeed, in *Calabretta*, which was decided in 1998, the Ninth Circuit expressly rejected the argument that a search warrant is not required for "home investigatory visits[.]"  *See Calabretta*, 189 F.3d at 813.  Similarly, and contrary to the City Defendants' argument, in *Wetzel* the California Supreme

---

[91]      *Id.* at 14:21–24.

-22-

1    Court held that a refusal to consent to a search "cannot constitute grounds for a

2    lawful arrest or subsequent search and seizure," nor is it a violation of

3    Cal. Penal Code § 148 because such refusal is no more than a "passive assertion

4    of a constitutional right[.]" *See Wetzel*, 11 Cal. 3d at 107–08. Therefore, the

5    individual officers are not entitled to qualified immunity with respect to

6    Plaintiffs' Second and Fourth Claims for Relief.

7       For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion with

8    respect to their Second and Fourth Claims for Relief on the issue of liability.

9    For the same reasons, the Court **DENIES** Defendants' Motion with respect to

10    Plaintiffs' Fourth Claim for Relief.

11    **C.**      **Third Claim for Relief**

12       The Third Claim for Relief is asserted by Mrs. Toman against FPD

13    Officers Macshane and McCaskill. The City Defendants move for summary

14    judgment with respect to this claim on the grounds that the force used was

15    reasonable and that Macshane and McCaskill are entitled to qualified immunity.

16    Mrs. Toman responds that a reasonable jury could find that the force used to

17    effectuate her arrest was unreasonable and that Macshane and McCaskill are not

18    entitled to qualified immunity. Furthermore, in her cross-motion, Mrs. Toman

19    contends that she is entitled to summary judgment with respect to this claim on

20    the issue of liability.

21    **1.**      **Excessive Force**

22       Claims of excessive force are subject to the Fourth Amendment's

23    "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

24    Determining whether the force used to effect a seizure is "reasonable" under

25    the Fourth Amendment requires the court to balance "'the nature and quality of

26    the intrusion on the individual's Fourth Amendment interests' against the

27    countervailing governmental interests at stake." *Id.* at 396. This inquiry is an

28    objective one: "the question is whether the officers' actions are 'objectively

1   reasonable' in light of the facts and circumstances confronting them, without

2   regard to their underlying intent or motivation." *Id.* at 397.  Among all the

3   factual circumstances at issue, the court considers "the severity of the crime at

4   issue, whether the suspect poses an immediate threat to the safety of the officers

5   or others, and whether he is actively resisting arrest or attempting to evade

6   arrest by flight." *Id.* at 396.  That analysis "must embody allowance for the fact

7   that police officers are often forced to make split-second judgments—in

8   circumstances that are tense, uncertain, and rapidly evolving . . . ." *Id.* at 396-

9   97.

10          Here, putting aside the Court's conclusion that the FPD Officers lacked

11  probable cause to arrest Mrs. Toman under Cal. Penal Code § 148, a reasonable

12  jury could find that the force used to effectuate Mrs. Toman's arrest was

13  unreasonable.  The crime that Mrs. Toman was suspected of committing—

14  violation of Cal. Penal Code § 148—was not severe; the officers were not there

15  to investigate Mrs. Toman; there was no indication that Mrs. Toman intended

16  to be violent or that she had ever been violent; the officers entered the

17  apartment swiftly and abruptly; and Macshane and McCaskill did not request

18  that Mrs. Toman voluntarily submit to handcuffing.  *See Blankenhorn v. City of*

19  *Orange*, 485 F.3d 463, 478–80 (9th Cir. 2007) (reversing a grant of summary

20  judgment in favor of officers on similar facts, concluding that the force could still

21  be excessive, and the officers' precipitate actions in making the arrest, including

22  the "lack of forewarning, the swiftness, and the violence with which the

23  defendant officers threw themselves upon Blankenhorn could reasonably be

24  considered 'provocative,' triggering Blankenhorn's limited right to reasonable

25  resistance").  To the extent that Macshane and McCaskill contend that it was

26  necessary to detain Mrs. Toman physically because she resisted by backing up

27  toward the bathroom and attempting to pull her arm away, the Court is

28

1  unconvinced.  It is for a jury to determine whether the force applied to
2  Mrs. Toman's restraint was a reasonable response to her perceived resistance.

3  **2.   Qualified Immunity**

4       Likewise, a genuine issue of material fact exists regarding whether
5  Macshane and McCaskill are entitled to qualified immunity.  The
6  unconstitutionality of the officers' conduct was clearly established in light of
7  *Blankenhorn*, and they were on notice that grabbing and tackling a misdemeanor
8  suspect without warning, when the person is not resisting, and without
9  attempting first to handcuff the person nonviolently, can be excessive, and that a
10 person's act of pulling her arm out of officers' grasp does not necessarily justify
11 force thereafter.

12      There are genuine factual disputes regarding the reasonableness of the
13 force used against Mrs. Toman.  Accordingly, the Court **DENIES** both
14 Defendants' Motion and Plaintiffs' Motion with respect to the Third Claim for
15 Relief.

16 **D.    Seventh, Eighth, and Tenth Claims for Relief**

17      Plaintiffs' Seventh Claim for Relief, asserted by Mrs. Toman against
18 Officers Macshane and McCaskill, is for excessive force in violation of
19 Cal. Const. Art. I, § 13 and Cal. Civ. Code § 52.1.  Plaintiffs' Eighth Claim for
20 Relief, asserted by all Plaintiffs against the City Defendants, is for false arrest in
21 violation of Cal. Const. Art. I, § 13 and Cal. Civ. Code § 52.1.  Plaintiffs' Tenth
22 Claim for Relief, asserted by Mrs. Toman against Officers Macshane and
23 McCaskill, is for assault and battery.  The City Defendants contend that they are
24 entitled to summary judgment on those claims because Cal. Const. Art. I, § 13
25 does not provide a private right of action and, with respect to the claims under
26 Cal. Civ. Code § 52.1, because Plaintiffs' constitutional rights were not violated.
27 The Court is not persuaded.

28

With respect to Cal. Const. Art. I, § 13, in determining whether money damages are available under the specific constitutional provision at issue for a specific alleged wrong, the court first looks "at the language and history of the provision for an affirmative intent to authorize a claim for damages . . . ." *Reinhardt v. Santa Clara County*, 2006 WL 662741, *8 (N.D. Cal. Mar. 15, 2006) (applying *Katzberg v. Regents of the University of California*, 29 Cal. 4th 300, 317 (2002)).  Where there is no such affirmative intent, the court must consider "whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision." *Id.*  Finally, "if these factors weigh against the recognition of a right to damages, the inquiry ends.  If, however, the factors weigh in favor of recognizing such a right, the court should also consider any special factors counseling hesitation in recognizing a damages action." *Id.*

In *Katzberg*, the California Supreme Court suggested that there should be a damages remedy for unlawful searches and seizures.  *See Katzberg*, 29 Cal. 4th at 321–25 ("We join the jurisdictions that have endorsed, implicitly or explicitly, the view set out in the Restatement, that courts, exercising their authority over the common law, may, in appropriate circumstances, recognize a tort action for damages to remedy a constitutional violation.").  This Court agrees with other district courts in this circuit[92]—the common law tradition of providing a damages remedy to those subjected to unlawful searches and seizures allows an inference within Cal. Const. Art. I, § 13 of an "intent to provide an action for damages[.]" *Id.* at 322–23 & 323 n.21; *see also Millender v. County of Los Angeles*, 2007 WL 7589200, at *39 (C.D. Cal. Mar. 15, 2007).  The California Supreme Court's implied endorsement in *Katzberg* of a damages action for a violation of the prohibition against unlawful searches and seizures leads this Court to

---

[92]     *See* Pls.' Opposition 25:1–9 (listing cases).

1  conclude, as have other courts in this District, that the California Supreme

2  Court would permit such an action.  *See Smith v. County of Riverside*, 2006 WL

3  8447071, at *7 (C.D. Cal. May 16, 2006).

4       A California statute protects citizens from the interference or attempted

5  interference, by means of "threat, intimidation, or coercion," with any right

6  guaranteed by state statute or the state constitution.  Cal. Civ. Code § 52.1(b).

7  Plaintiffs explicitly base their Bane Act claims on the violation of their rights to

8  be free from unreasonable searches and seizures—rights guaranteed to them by

9  Cal. Const. Art. I, § 13.  Thus, even if that California constitutional provision

10  itself did not allow for a private right of action, the Bane Act does.  Any state

11  actor who interferes or attempts to interfere with the freedom from

12  unreasonable searches and seizures right by means of threats, intimidation, or

13  coercion is subject to liability under the Bane Act.  The City Defendants do not

14  argue that there is a lack of evidence on this point, nor that no material facts are

15  in dispute.

16       With respect to Plaintiffs' Tenth Claim for Relief, the City Defendants'

17  only contention is that the officers' conduct—specifically, the force used against

18  Mrs. Toman—was reasonable.  However, for the reasons stated above, the

19  Court finds that there is a genuine dispute with respect to the reasonableness of

20  the force employed against Mrs. Toman.

21       Accordingly, the Court **DENIES** Defendants' Motion with respect to

22  Plaintiffs' Seventh, Eighth, and Tenth Claims for Relief.

### VI.  CONCLUSION

24       For the foregoing reasons, the Court hereby **ORDERS** as follows:

25       1.    Defendants' Motion for partial summary judgment is **GRANTED**

26  **in part**, with respect to Plaintiffs' First Claim for Relief, and **DENIED in part**,

27  with respect to Plaintiffs' Third, Fourth, Seventh, Eighth, and Tenth Claims for

28  Relief.

2.      Plaintiffs' Motion for summary judgment is **GRANTED in part**, with respect to the issue of liability on Plaintiffs' Second and Fourth Claims for Relief, and **DENIED in part**, with respect to Plaintiffs' First and Third Claims for Relief.

3.      The parties are **DIRECTED** to meet and confer and to file, no later than 12:00 noon on January 14, 2022, a Joint Report advising the Court of their joint proposal regarding the case schedule or, if the parties cannot agree, of their respective competing schedules and detailed reasons for their disagreement.

4.      The Court **SETS** a video scheduling conference for January 21, 2022, at 11:00 a.m.

**IT IS SO ORDERED.**

Dated: December 27, 2021

John W. Holcomb
UNITED STATES DISTRICT JUDGE